**In the Matter of the APPEAL OF Robert and Julie ROCHELEAU of a Decision of the Carver County Environmental Services.**

No. A03–2046.

Court of Appeals of Minnesota.

Sept. 28, 2004.

---

Jon Erik Kingstad, Oakdale, MN, for relators Robert and Julie Rocheleau.

Paul D. Reuvers, Susan M. Tindal, Iverson Reuvers, LLC, Bloomington, MN, for respondent Carver County.

Mike Hatch, Attorney General, Paul Merwin, Assistant Attorney General, St. Paul, MN, amicus for MN Pollution Control Agency.

Considered and decided by SCHUMACHER, Presiding Judge, HALBROOKS, Judge, and PARKER, Judge.*

## OPINION

HALBROOKS, Judge.

Relators challenge a decision by the Carver County Board of Commissioners affirming Carver County Environmental Services' decision that relators' septic system had the potential to immediately threaten public health or safety and requiring them to submit a new design for a replacement septic system. Relators argue that (1) the county ordinance is preempted by state law; (2) the board's decision is unreasonable, oppressive, arbitrary, without evidentiary support, and based on an erroneous theory of law; (3) the relevant statute violates the separation-of-powers clause by vesting quasi-judicial authority in executive-branch employees without a mechanism for judicial review; (4) the statute violates the due-process clauses of the state and federal constitutions by creating an irrebuttable presumption; and (5) the relevant rules, which have been incorporated into the ordinance, are void for vagueness and for

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

creating an irrebuttable presumption. We affirm.

## FACTS

Carver County adopted an individual-sewage-treatment system (ISTS) ordinance pursuant to Minn.Stat. §§ 115.55, 115.56 (2002) and Minn.Stat. ch. 145A (2002). See Carver County, Minn., Code of Ordinances § 52.002 (2001).[1] The ordinance regulates the design, location, installation, inspection, use, monitoring, and maintenance of all ISTSs located in Carver County, and it incorporates by reference all of Minn. R. 7080 (2003), the Minnesota Pollution Control Agency's (MPCA) ISTS program rules, except as amended in the ordinance. Carver County, Minn., Code of Ordinances § 52.001 (2001). The goal of the ordinance is to prevent adverse health and safety effects to the public and the environment from the discharge of inadequately treated sewage. Id. Carver County's ISTS program is administered by Carver County Environmental Services (CCES).

Under the applicable statute, rules, and ordinance, several requirements apply to ISTSs. Relevant here is the "vertical separation" requirement. "Vertical separation" is the vertical measurement of unsaturated soil or sand between the bottom of an ISTS's distribution median and saturated soil or bedrock. Minn. R. 7080.0020, subp. 49b. To measure vertical separation, one must determine the depth of the seasonally high water table or "saturated soil" and compare it to the depth of the bottom of the existing ISTS or the system being designed. This measurement is significant because if there is an insufficient amount of unsaturated soil or sand below the system, inadequately treated sewage can reach the saturated soil and move into nearby bodies of water.

"Saturated soil" is defined as "the highest elevation in the soil that is in a reduced chemical state because of soil voids being filled with water." Id. at subp. 29a. Saturated soil is evinced by the "presence of redoximorphic features or other information." Id. "Redoximorphic features" are defined as "features formed in saturated soil by the process of reduction, translocation, and oxidation of iron and manganese compounds, or other soil, landscape or vegetative indicators." Id. at subp. 28e; see also Minn. R. 7080.0110, subp. 4(D)(5). This is commonly known as "mottling." Id. Generally, mottling occurs when water has remained in soil for a significant period of time, depleting the soil's oxygen and causing the microbes living there to search for oxygen in nitrates, iron, and manganese compounds. When the water ultimately drains, varying concentrations of the compounds are distributed throughout the soil, and the reoccurrence of oxygen creates variances in color. Thus, color variances are a common visual indicator of redoximorphic features, with light spots indicating soil in a reduced state and dark spots tending to show oxidized soil. Although "false mottling" can occur where color variances in the soil are due to the presence of calcium carbonates, as opposed to a reduced environment caused by water in the soil, a "weak acid" test can be used to determine whether calcium carbonates have caused mottling. According to the expert testimony presented in this case, the "other information" evincing saturated soil can include the nature, content, permeability, classification, and slope of the soil, as determined by observation, examination, testing, or reference materials. It

---

1. This ordinance was adopted as Individual Sewage Treatment System Ordinance No. 21F on April 17, 2001, and is codified in Title V, Chapter 52 of the Carver County Code of Ordinances at http://www.co.carver.mn.us/pz/code.asp.

can also include hydrology information from reference materials, water-level measurements, and other observations and testing.

Any ISTS built before April 1, 1996, must have at least two feet of vertical separation between the bottom of the system's distribution medium and saturated soil or bedrock. Minn. R. 7080.0060, subp. 3(B). Any ISTS built after March 31, 1996, must have three feet of vertical separation. *Id.* An existing ISTS is classified as "failing" if it lacks the requisite vertical separation. Minn. R. 7080.0020, subp. 16b. Furthermore, an existing ISTS is classified as an imminent threat to public health or safety (IPHT) if it creates a situation "with the potential to immediately and adversely affect or threaten public health or safety." *Id.* at subp. 19a. Such situations include discharging sewage to the ground surface or surface water and sewage backing up into a dwelling or other establishment. *Id.* Discharging to a draintile is also considered an IPHT according to the MPCA's compliance inspection form.

In May 2001, Carver County received an anonymous complaint that the ISTS on relators Robert and Julie Rocheleau's property was discharging sewage into nearby Smith Lake. Shortly thereafter, CCES employees Mary West and Scott Weinzierl visited relators' property to investigate the complaint, where they located the discharge point near the lake and observed effluent coming out of it. The next day, CCES sent a letter to relators requesting that they provide them with information about their ISTS.

Relators subsequently hired Jim Wickenhauser, a licensed ISTS inspector, to perform a compliance inspection. In his December 2001 report, Wickenhauser made no mention of the draintile that ran toward Smith Lake or the PVC pipe connecting the septic tank to it. He did note,

however, that the septic-tank depth was such that any drainfield would be down 48 inches and that he had found mottling at 42 inches. Based on these findings, Wickenhauser classified relators' ISTS as an IPHT, pursuant to Minn. R. 7080.0020, subp. 19a, and Carver County, Minn., Code of Ordinances § 52.003 (2001). Wickenhauser also classified the ISTS as "failing" because it had less than three feet of vertical separation between the system bottom and saturated soil, as indicated by mottling at 42 inches. Based on Wickenhauser's report, CCES notified relators that their ISTS constituted an IPHT and ordered them to bring it into compliance within ten months. *See* Carver County, Minn., Code of Ordinances § 52.075(B) (2001) (requiring that "[a] system determined to be failing or non-complying and an IPHT must be brought into compliance within ten months of the date of discovery").

In August 2002, relators hired Bob Koch, a licensed ISTS contractor, to design a new ISTS. Koch visited the site and found mottling at 48 inches, a slope of seven percent, and a percolation rate of 33.6 minutes per inch. Based on these findings, Koch recommended construction of a shallow trench system with an estimated cost of $5,000 to $6,000, and relators submitted the proposed design to CCES.

West subsequently returned to relators' property on CCES's behalf, where she made a slope determination of four to five percent and observed mottling at 40 to 42 inches. Based on the differing mottling-depth results and West's conclusion that Koch's proposed design would not work due to the lack of adequate separation from the seasonally high water table, CCES refused to approve Koch's design. Instead, CCES told relators to install an at-grade or above-ground system, with an estimated cost of $10,000 to $12,000.

Due to this substantial difference in price, relators contacted the Headwaters Rural Utilities Association (HRUA) for a more definitive answer on the mottling depth, and John Nieber, Ph.D.; Ronnie Daanen; and Dan Wheeler inspected the site on HRUA's behalf. Nieber and Daanen hypothesized that the seasonally saturated layer was no longer at the 42– to 48–inch level indicated by the redoximorphic features but was at a lower level. Wheeler, on the other hand, opined that there was "strong evidence" of redoximorphic features at the site and that the depth of the seasonal water table was between 42 and 48 inches.

Relators then attempted to mitigate the IPHT by excavating a trench on their property and by plugging the draintile that transported the sewage to Smith Lake. This action was taken without CCES's permission and without a permit as required by Carver County, Minn., Code of Ordinances § 52.030 (2001). Shortly thereafter, at HRUA's suggestion, relators retained engineer Brian Van Beusekom to re-determine their system's classifications and evaluate the location of the water table near the tile line.

In October 2002, Van Beusekom visited the site, where he observed that the trench was dry and that there was mottling at 42 to 48 inches. In his compliance inspection report, Van Beusekom stated that there was no discharge of sewage to the ground surface, draintile, or surface waters; no sewage backup into the dwelling; and no situation with the potential to immediately and adversely impact or threaten public health or safety. Consequently, Van Beusekom concluded that relators' ISTS did not pose an IPHT. But acknowledging the different opinions as to the depth of satu-

rated soil, Van Beusekom adopted the "shallow" view of 42 inches and concluded that the system was "failing" because of the lack of three feet of vertical separation between the system bottom and saturated soil.[2]

Although CCES agreed with Van Beusekom's conclusion that relators' system was "failing," they disagreed with his finding that the system did not pose an IPHT. Instead, CCES concluded that an IPHT existed because there was still discharge of sewage to the drain tile. On November 1, 2002, CCES notified relators of its conclusion and directed them to submit a new ISTS design by November 15, 2002. CCES also informed relators that they could appeal this decision by requesting an administrative hearing or a formal hearing pursuant to Carver County, Minn., Code of Ordinances §§ 52.136 and 52.137 (2001).

On November 14, 2002, Dr. Nieber submitted a report to provide a basis for appealing CCES's decision. He determined that because the drain line had been cut and capped, an alarm system had been installed, and the tank manhole had been raised to facilitate pumping, the system was no longer an IPHT. Dr. Nieber also stated that the system should be replaced with a modern ISTS, to be designed after further testing determined whether the redoximorphic features indicated the current saturated soil level or were archaic.

On November 15, 2002, relators requested an administrative hearing pursuant to Carver County Ordinance § 52.136. The hearing was held on December 10, 2002, before Administrative Hearing Officer Joseph Enfield, the Assistant Director of CCES. On February 14, 2003, Enfield issued his decision, finding that relators' at-

---

**2.** Van Beusekom later changed his opinion and concluded there was at least two feet, and possibly three feet, of separation between the system bottom and saturated soil. In March 2003, Van Beusekom amended his report and concluded that the system was not failing.

tempt to mitigate the IPHT by excavating a trench "did not abate the failure of the ISTS" and that because "[t]here remain[ed] no soil treatment area and the truncation of the tile line has increased the possibility of sewage backup into the dwelling," the ISTS was "still an IPHT." Enfield also denied relators' request for a variance, stating that "[a] standard ISTS can be installed on the property" and that state law required the ISTS to be "upgraded, replaced, or its use discontinued within 10 months." *See* Minn.Stat. § 115.55, subp. 5a(b).

Relators appealed Enfield's decision pursuant to Carver County Ordinance § 52.137. Accordingly, Carver County requested appointment of an administrative law judge (ALJ) pursuant to Minn.Stat. § 14.55 (2002), and a hearing was held on April 7, 8, and 21, 2003. Four experts testified at the hearing, presenting their opinions based on the results of their investigations. According to West and Wheeler, the redoximorphic features, soils, slopes, vegetation, history, and other information, including the lack of water in the soil in recent months, indicated that the redoximorphic features were at the level of the seasonally saturated soil. On the other hand, according to Dr. Nieber and Daanen, the lack of water in the soil in recent months indicated a much lower level of the seasonally saturated soil.

After weighing the conflicting expert testimony, the ALJ made the following conclusions:

4. The redoximorphic features 42 inches below the surface of the ground at the site of the Rocheleaus' septic system, along with the other information presented, demonstrate the presence of seasonally saturated soil at that level at the site.

5. The Rocheleaus' septic system is "failing" under the ISTS Ordinance ...

and Minn. R. 7080.0060, subp. 3.B.2 because the bottom of the system is less than two feet above the level of seasonally saturated soil at the site.

6. The depth of the seasonally saturated soil at the site [is not] sufficient to allow a shallow trench system (bottom at 12 inches or less) to be installed at the site.

The ALJ also stated that "[u]ltimately, the statutes, rules, and ordinances make CCES responsible for determining whether an ISTS meets requirements. CCES has demonstrated that it made the correct determinations in this case." Consequently, the ALJ recommended affirming Enfield's decision.

On December 1, 2003, the Carver County Board of Commissioners adopted the ALJ's recommendation and extended relators' date of compliance to June 15, 2004. This appeal follows.

## ISSUES

1. Do Minn.Stat. § 115.55, subds. 5, 5a (2002), preempt Carver County, Minn., Code of Ordinances ch. 52 (2001)?

2. Is the Carver County Board of Commissioners' decision unreasonable, oppressive, fraudulent, without evidentiary support, or based on an erroneous theory of law?

3. Do Minn.Stat. § 115.55, subds. 5, 5a, violate the separation-of-powers clause by vesting quasi-judicial authority on executive-branch employees without a mechanism for judicial review?

4. Does Minn.Stat. § 115.55, subd. 5a, violate the due-process clauses of the state and federal constitutions by creating an irrebuttable presumption?

5. Is Minn. R. 7080.0060, subp. 3 (2003), void for vagueness and for creating an irrebuttable presumption?

## ANALYSIS

### I.

■ Relators argue that the Carver County Board of Commissioners (the board) lacked jurisdiction over the inspection of their ISTS. Relators base this argument on their contention that the Carver County, Minn., Code of Ordinances ch. 52 (2001), is preempted by Minn.Stat. § 115.55, subds. 5, 5a (2002). On appeal, when there are no disputed facts, the issue of whether a state statute renders a local law unenforceable is a question of law, which we review de novo. *Nordmarken v. City of Richfield,* 641 N.W.2d 343, 346 (Minn.App.2002).

■ Preemption is defined as "occupying the field" in Minnesota. *Mangold Midwest Co. v. Village of Richfield,* 274 Minn. 347, 356, 143 N.W.2d 813, 819 (1966). "The doctrine of preemption is premised on the right of the state to so extensively and intensively occupy a particular field or subject with state laws that there is no reason for municipal regulation." *Nordmarken,* 641 N.W.2d at 348. Thus, "[i]f preemption has occurred, a local law purporting to govern, regulate, or control an aspect of the preempted field will be void, even if the local law is not in conflict with the state law." *Id.*

■ In determining whether preemption has occurred, Minnesota courts consider four factors: (1) the subject matter regulated; (2) whether the subject matter is so fully covered by state law that it has become solely a matter of state concern; (3) whether any partial legislation on the subject matter evinces an intent to treat the subject matter as being solely a state concern; and (4) whether the nature of the subject matter is such that local regulation will have an adverse effect on the general state population. *Mangold,* 274 Minn. at 358, 143 N.W.2d at 820. "The question of whether state law has preempted a field depends on the facts and circumstances of each case." *Nordmarken,* 641 N.W.2d at 348.

■ Here, the subject matter at issue is the regulation of existing ISTSs. Citing Minn.Stat. § 115.55, subd. 5a(c), relators argue that the statute reflects a legislative intent to "occupy the field" of ISTS regulation. We disagree. To the contrary, the statute explicitly provides for regulation of ISTSs by local governments. Minn.Stat. § 115.55, subd. 2(a) (2002), states that "[a]ll counties ... must adopt ordinances that comply with individual sewage treatment system rules by January 1, 1999, unless all towns and cities in the county have adopted such ordinances." Furthermore, Minn.Stat. § 115.55, subd. 4 (2002), requires every "person who ... inspects all or part of an individual sewage treatment system [to] comply with the applicable requirements." "Applicable requirements" are defined as "(1) local ordinances that comply with the individual sewage treatment system rules, as required in subdivision 2; or (2) in areas not subject to the ordinances described in clause (1), the individual sewage treatment system rules." Minn.Stat. § 115.55, subd. 1(c) (2002). Minn.Stat. § 115.55, subd. 3 (2002), also directs the MPCA to "adopt rules containing minimum standards and criteria" for ISTSs, and those rules must include, among other things, "how the agency will ensure compliance under subdivision 2" and "how local units of government shall enforce ordinances under subdivision 2, including requirements for permits and inspection programs." In accordance with this subdivision, the MPCA adopted Minn.

R. 7080.0305–.0315 (2003), which detail what local ordinances must include in order to meet the requirements of the statute. Specifically, Minn. R. 7080.0310 and Minn. R. 7080.0315 require counties to adopt ordinances that include permit programs and inspection programs for ISTSs. These rules also explicitly provide that local ordinances may be more restrictive than the statute and rules. Minn. R. 7080.0305.

Because the statute expressly provides for local regulation by permitting local governments to enact more restrictive ordinances, the legislature has made it clear that the doctrine of preemption does not preclude all local ordinances that cover the same subject matter as the statute controls. *See Altenburg v. Bd. of Supervisors of Pleasant Mound Township*, 615 N.W.2d 874, 880–81 (Minn.App.2000). Therefore, we conclude that Minn.Stat. § 115.55 (2002) does not "occupy the field" of ISTS regulation, and consequently, Carver County has jurisdiction to regulate relators' ISTS.

## II.

■ Next, relators challenge the board's decision, which adopted the ALJ's findings and recommendation. On certiorari review of a quasi-judicial agency's decision, this court is limited to considering whether "(a) the agency had jurisdiction; (b) the proceedings were fair and regular; and (c) the agency's decision was unreasonable, oppressive, arbitrary, fraudulent, without evidentiary support, or based on an incorrect theory of law." *Hannan v. City of Minneapolis*, 623 N.W.2d 281, 283–84 (Minn.App.2001) (quotations omitted). "The reviewing court is not to retry the facts or make credibility determinations." *Senior v. City of Edina*, 547 N.W.2d 411, 416 (Minn.App.1996) (citing *Dokmo v. Indep. Sch. Dist. No. 11*, 459 N.W.2d 671,

674–75 (Minn.1990)). We will uphold the board's decision so long as the board "furnished any legal and substantial basis for the action taken." *Id.* (quoting *Beck v. Council of St. Paul*, 235 Minn. 56, 58, 50 N.W.2d 81, 82 (1951)).

■ Relators seem to argue that the board's decision was unreasonable and without evidentiary support because CCES failed to carry its burden of proving that their existing ISTS, or their proposed ISTS, was "noncomplying" or that it "failed to provide sufficient groundwater protection." Under Carver County Ordinance § 52.004, in order for an ISTS to be in compliance, effluent must not "be discharged to the ground surface, abandoned well, or bodies of surface water, or into any rock or soil formation ... or into any well, agricultural tile, or other excavations in the ground."

After making extensive factual findings based on the testimony at the hearing, the ALJ made the following conclusions, which were adopted by the board:

> 4. The redoximorphic features 42 inches below the surface of the ground at the site of the [relators'] septic system, along with the other information presented, demonstrate the presence of seasonally saturated soil at that level at the site.
>
> 5. The [relators'] septic system is "failing" under the ISTS Ordinance ... and Minn. R. 7080.0060, subp. 3.B.2 because the bottom of the system is less than two feet above the level of seasonally saturated soil at the site.
>
> 6. The depth of the seasonally saturated soil at the site [is not] sufficient to allow a shallow trench system (bottom at 12 inches or less) to be installed at the site.

Addressing the varying expert testimony, the ALJ also stated:

To West and Wheeler, the redoximorphic features, soils, slopes, vegetation, history, and other information including the lack of water in the soil in recent months, indicate that the redoximorphic features are at the level of the seasonally saturated soil. To Dr. Nieber and Daanen, the lack of water in the soil in recent month[s] indicates a much lower level of the seasonally saturated soil and they have postulated some theories as to why the redoximorphic features exist at 42 inches.

The greater weight of the evidence is that the seasonally saturated layer is at the 42 inch level of the redoximorphic features. Minn. R. 7080.0020, subp. 29a, makes redoximorphic features the primary indicator of saturated soil because that is what the current research indicates. There are certainly unanswered questions about redoximorphic features, such as little research demonstrating how long they take to form or how long they last, but the research is continuing. The lack of water recently at the Rocheleau site down at least 15 feet raises questions, but is too short term to overcome the presumption created by the redoximorphic features. The possible explanations offered by Nieber and Daanen are only possibilities and have some weaknesses.

. . . .

Ultimately, the statutes, rules, and ordinances make CCES responsible for determining whether an ISTS meets requirements. CCES has demonstrated that it made the correct determinations in this case.

■ This language makes clear that the ALJ carefully weighed the conflicting evidence presented at the hearing and ultimately was more persuaded by the CCES experts than relators' experts. By voting to adopt the ALJ's findings, the board agreed with the ALJ's reasoning. Appellate courts routinely recognize that "[t]he functions of factfinding, resolving conflicts in the testimony, and determining the weight to be given to it and the inferences to be drawn therefrom rest with the administrative board." *Quinn Distrib. Co. v. Quast Transfer, Inc.*, 288 Minn. 442, 181 N.W.2d 696, 700 (1970) (quotation omitted); *see also In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn.2001). Furthermore, we give "substantial judicial deference" to an administrative board's factfinding process. *Info Tel Communications, L.L.C. v. Minn. Pub. Utils. Comm'n*, 592 N.W.2d 880, 884 (Minn.App.1999). Although relators ask this court to re-weigh the evidence and to conclude that their experts were more credible, that is not our function. Therefore, because West and Wheeler's testimony provided adequate support for the board's conclusion that relators' system was non-compliant, we conclude that the board's decision was not unreasonable, oppressive, arbitrary, fraudulent, without evidentiary support, or based on an incorrect theory of law. *See Hannan*, 623 N.W.2d at 283–84.

## III.

■ Relators argue that Minn.Stat. § 115.55, subds. 5, 5a, violate the Minnesota separation-of-powers doctrine by vesting quasi-judicial authority on licensed ISTS inspectors without a mechanism for judicial review. "Minnesota statutes are presumed constitutional, and our power to declare a statute unconstitutional should be exercised with extreme caution and only when absolutely necessary." *In re Haggerty*, 448 N.W.2d 363, 364 (Minn. 1989). The party challenging a statute has the burden of demonstrating beyond a reasonable doubt that it violates some constitutional provision. *Id.* Because the evalua-

tion of a statute's constitutionality is a question of law, we review this issue de novo. *Hamilton v. Comm'r of Pub. Safety,* 600 N.W.2d 720, 722 (Minn.1999).

▮▮ In its amicus brief, the attorney general argues that relators have failed to present a justiciable controversy on this issue because they have suffered no injury from a decision of a licensed ISTS inspector. This argument has merit because, as the attorney general aptly points out, the board, not the ISTS inspector, made the only binding decision regarding relators' ISTS. But even if we address the merits of relators' argument, their constitutional challenge fails. The board's decision was made following an investigation and decision by CCES staff, an appeal from the staff decision, an appeal from a CCES management decision, and an evidentiary hearing before an ALJ. Moreover, relators gained further judicial review of the board's decision through a writ of certiorari to this court. Thus, there is no merit to relators' argument that the statute allows ISTS inspectors to make quasi-judicial decisions without any mechanism for judicial review.

### IV.

Relators argue that Minn.Stat. § 115.55, subd. 5a, violates the due-process clauses of the state and federal constitutions. Minn.Stat. § 115.55, subd. 5a, provides, in part:

(a) An inspection of an existing system must evaluate the criteria in paragraphs (b) to (j).

(b) If the inspector finds one or more of the following conditions:

(1) sewage discharge to surface water;

(2) sewage discharge to ground surface;

(3) sewage backup; or

(4) any other situation with the potential to immediately and adversely affect or threaten public health or safety,

then the system constitutes an imminent threat to public health or safety and, if not repaired, must be upgraded, replaced, or its use discontinued within ten months of receipt of the notice described in subdivision 5b, or within a shorter period of time if required by local ordinance.

Relators argue that the statute violates due process because it creates an irrebuttable presumption of an IPHT from the mere "potential to immediately and adversely threaten public health or safety." Relators also argue that the statute authorizes an ISTS inspector to "declare a public nuisance that which in fact is not a public nuisance," and upon such a declaration, "even the County Board cannot undo such a finding." Relators contend that because the legislature does not have the power to declare what shall be conclusive evidence, this irrebuttable presumption "violates a person's due process rights to a hearing." We disagree.

▮ "[S]tatutes creating conclusive presumptions of law or fact have been almost uniformly declared unconstitutional as denying due process of law." *State v. Clausen,* 493 N.W.2d 113, 115 (Minn.1992) (quotation omitted). But here, the statute does not contain any such presumptions; it merely sets forth criteria for inspectors to evaluate in determining whether an existing ISTS constitutes an IPHT. While an inspector can make an initial determination as to whether an IPHT exists without a hearing, the county has adopted the ISTS ordinance pursuant to the statute, which provides that "[a]n applicant or permittee wishing to appeal a Departmental decision may request an Administrative hearing" and that he or she may further appeal that decision in a formal hearing.

Carver County, Minn., Code of Ordinances, §§ 52.136, 52.137. During this appeal process, both the county and the property owners are able to present evidence concerning whether these criteria have been satisfied, as the parties did here. Because the statute allows for a meaningful opportunity to be heard and to dispute an inspector's finding of an IPHT, we conclude that Minn.Stat. § 115.55, subd. 5a, does not violate due process.

## V.

Relators argue that the "compliance criteria" in Minn. R. 7080.0060, subp. 3, which rely on the definitions of redoximorphic features, saturated soil, and vertical separation in Minn. R. 7080.0020, subps. 28e, 29a, 49b, and on the field-evaluation criteria outlined in Minn. R. 7080.0110, subp. 4, are void for vagueness and for creating an irrebuttable presumption based on the subjective evaluations of ISTS inspectors.

■ Like statutes, the MPCA's rules must meet due-process standards of definiteness under both the state and federal constitutions. *Minn. Chamber of Commerce v. Minn. Pollution Control Agency,* 469 N.W.2d 100, 107 (Minn.App.1991), *review denied* (Minn. July 24, 1991). "In attacking a rule on due process grounds, including a vagueness challenge, the challenger bears a heavy burden." *Id.* A rule is void for vagueness "if it fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited or fails to provide sufficient standards for enforcement." *Id.* (quoting *In re N.P.,* 361 N.W.2d 386, 394 (Minn.1985)). Rules "should be upheld unless the terms are so uncertain and indefinite that after exhausting all rules of construction it is impossible to ascertain legislative intent." *Id.* (quotation omitted).

■ Relators argue that "[d]espite their scientific veneer, the definitions of 'saturated soil,' 'vertical separation' and 'redoximorphic features,' the soils tests for whether these features exist in a particular soil sample is inherently subjective, based upon the *interpretation* of 'soil mottling' or splotches of colors" by ISTS inspectors. Relators contend that because enforcement of the ordinance hinges on the inspector's subjective state of mind, the rules and ordinance "invite arbitrary enforcement."

But these conclusory statements are insufficient to satisfy relators' heavy burden of demonstrating that the rules fail to provide adequate standards for enforcement, and the rules are not rendered unconstitutionally vague simply because one expert testified that the interpretation of whether soil mottling constitutes redoximorphic features is "inexact and subjective." Nor do relators adequately show that the rules are so indefinite that persons of ordinary intelligence must guess at their meaning. *See, e.g., State v. Normandale Props., Inc.,* 420 N.W.2d 259, 262 (Minn.App.1988) (holding that the statute defining hazardous waste was not unconstitutional merely because the legislature "could have defined hazardous waste more precisely"), *review denied* (Minn. May 4, 1988). Therefore, we conclude that relators have not established that the rules are void for vagueness.

■ Furthermore, we reject relators' argument that the rules and ordinance create an irrebuttable presumption by making redoximorphic features the primary indicator of saturated soil. The regulations themselves provide for the introduction of evidence other than redoximorphic features, *see* Minn. R. 7080.0020, subp. 29a (stating that "[s]aturated soil is evidenced by the presence of redoximorphic features or *other information*" (emphasis added)), and relators had ample opportunity to

present, and did present, such evidence. Therefore, relators' argument that the rules create an unconstitutional irrebuttable presumption also fails.

## DECISION

Because Minn.Stat. § 115.55, subds. 5, 5a (2002), expressly provide for local regulation, we conclude that the doctrine of preemption does not preclude Carver County from regulating relators' ISTS through its own ordinance. Furthermore, because there is adequate support in the record for the board's conclusion that relators' system was non-compliant, we conclude that the decision is not unreasonable, oppressive, fraudulent, without evidentiary support, or based on an erroneous theory of law.

Although we conclude that relators have failed to present a justiciable controversy on whether Minn.Stat. § 115.55, subds. 5, 5a, violate the separation-of-powers clause by vesting quasi-judicial authority in licensed ISTS inspectors without a mechanism for judicial review, we nonetheless conclude that relators' argument fails because the statute explicitly allows for judicial review. Moreover, because the statute allows for a meaningful opportunity to be heard and to dispute an inspector's finding of an IPHT, we conclude that subdivision 5a does not violate the due-process clauses of the state and federal constitutions by creating an irrebuttable presumption.

Because relators have failed to demonstrate that Minn. R. 7080.0060, subp. 3 (2003), which relies on the definitions set forth in Minn. R. 7080.0020, subps. 28e, 29a, 49b (2003), and the criteria outlined in Minn. R. 7080.0110, subp. 4 (2003), is indefinite or fails to provide adequate standards for enforcement, we conclude that these rules are not void for vagueness. Additionally, because the rules specifically provide for the introduction of evidence other than redoximorphic features to establish saturated soil, we also conclude that the rules do not create an unconstitutional irrebuttable presumption.

**Affirmed.**