*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0123**

In the Matter of the Decision
to Deny the Petitions for a Contested Case Hearing and
to Submit the Draft Little Rock Creek Dissolved Oxygen, Nitrate, Temperature,
and Fish Bioassessment Total Maximum Daily Load Study to the
U.S. Environmental Protection Agency for Approval.

**Filed November 28, 2016
Affirmed
Reilly, Judge**

Minnesota Pollution Control Agency

Matthew C. Berger, Dean M. Zimmerli, Gislason & Hunter LLP, New Ulm, Minnesota (for relators Duane Kroll, et al.)

Lori Swanson, Attorney General, Ann E. Cohen, Assistant Attorney General, St. Paul, Minnesota (for respondent Minnesota Pollution Control Agency)

Considered and decided by Reilly, Presiding Judge; Halbrooks, Judge; and Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REILLY**, Judge

Relator-landowners petitioned for certiorari review of the Minnesota Pollution Control Agency's (the MPCA) decision to submit a Total Maximum Daily Load (TMDL) study of the Little Rock Creek watershed area to the Environmental Protection Agency (the EPA) for approval pursuant to the federal Clean Water Act, 33 U.S.C. § 1313(d) (2012) (the CWA). The MPCA asserts that (1) relators lack standing to pursue this certiorari

appeal; (2) the MPCA's decision is supported by the record; and (3) relators are not entitled to a contested-case hearing. We determine that relators have standing through a legislative enactment granting standing. However, because relators have not met their burden of demonstrating that the MPCA's decision was unsupported by the record and the MPCA did not err by denying a contested-case hearing, we affirm.

## FACTS

### I. Parties

Relators are residents, landowners, and farmers near the Little Rock Creek watershed. The MPCA is the state agency charged with enforcing the CWA and has the authority to "administer and enforce all laws relating to the pollution of any of the waters of the state." Minn. Stat. §115.03, subd. 1(a) (2014); *Minn. Envtl. Sci. & Econ. Review Bd. v. Minn. Pollution Control Agency*, 870 N.W.2d 97, 99 (Minn. App. 2015).

### II. Statutory and Regulatory Framework

The stated objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2012). To attain this objective, the CWA provides two methods for controlling water pollution: effluent limitations and water quality standards. *Arkansas v. Oklahoma*, 503 U.S. 91, 101, 112 S. Ct. 1046, 1054 (1992). "Effluent limitations" restrict the "quantities, rates, and concentrations of chemical, physical, biological, and other constituents" discharged from point sources into waterways. *Id.*; 33 U.S.C. § 1362(11) (2012). "Point sources" are "any discernible, confined and discrete conveyance" from which pollutants are or may be discharged including pipes, ditches, tunnels, wells, and other containers. 33 U.S.C.

2

§1362(14) (2014). Unlike point source discharges, "nonpoint-source discharges" are not explicitly defined by the CWA, but have been described as "nothing more than a water pollution problem not involving a discharge from a point source." *Defs. of Wildlife v. U.S. Envtl. Prot. Agency*, 415 F.3d 1121, 1124 (10th Cir. 2005) (quotation omitted).[1]

"Water quality standards set the permissible level of pollution in a specific body of water without direct regulation of the individual sources of pollution." *City of Arcadia v. U.S. Envtl. Prot. Agency*, 411 F.3d 1103, 1105 (9th Cir. 2005). The CWA requires each state to adopt water quality standards for bodies of water within the state's boundaries that "establish the desired condition of a body of water." *In re Cities of Annandale & Maple Lake NPDES/SDS Permit*, 731 N.W.2d 502, 510 (Minn. 2007); 33 U.S.C. § 1313(a)-(c). After establishing its water quality standards, a state is required by the CWA to identify "impaired" bodies of water within its boundaries that fail to meet those standards. 33 U.S.C. § 1313(d)(1)(a); 40 C.F.R. § 130.7(b). This list of substandard waters is known as the "§ 303(d) list" or the "impaired waters" list. *Thomas v. Jackson*, 581 F.3d 658, 661, 667 (8th Cir. 2009). When creating a § 303(d) list, a state "must assemble and evaluate all existing and readily available water quality-related data and information." *Id.* at 661 (citing 40 C.F.R. § 130.7(b)(5)).

For each impaired body of water on the § 303(d) list, the state must establish a TMDL for each pollutant the water can sustain without exceeding water quality standards.

---

[1] A number of federal courts have rendered decisions arising out of the federal Clean Water Act, 33 U.S.C. § 1313(d), and we find the reasoning in these federal decisions to be persuasive authority in the present case.

*Id.* at 662; 33 U.S.C. § 1313(d)(1)(C) (articulating this requirement). A TMDL is defined as:

> the sum of the pollutant load allocations for all sources of the pollutant, including a wasteload allocation for point sources, a load allocation for nonpoint sources and natural background, an allocation for future growth of point and nonpoint sources, and a margin of safety to account for uncertainty about the relationship between pollutant loads and the quality of the receiving surface water.

Minn. Stat. § 114D.15, subd. 10 (2014) (defining TMDL as "a scientific study that contains a calculation of the maximum amount of a pollutant that may be introduced into a surface water and still ensure that applicable water quality standards for that water are restored and maintained"); 40 C.F.R. § 130.2(g)-(i) (defining load allocation, wasteload allocation, and TMDL allocation); 33 U.S.C. § 1362(6) (defining "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water"). The state must submit its § 303(d) list and the TMDL to the EPA for approval. 33 U.S.C. § 1313(d)(2). The EPA will either approve or disapprove the state's § 303(d) list within 30 days of submission and, if the EPA disapproves a state's § 303(d) list, it will establish its own list within 30 days of the date of disapproval. 40 C.F.R. § 130.7(d)(2).

### III.    Factual and Procedural Background

Little Rock Creek is a DNR-designated trout stream in central Minnesota. The land-use in the watershed area consists of approximately 50% crops, 14% woodland, 22% grass

4

and pasture, 13% water and wetlands, and less than 1% residential development. The area is considered "highly altered by human influenced agricultural land uses."

In 2002, the MPCA proposed placing Little Rock Creek on the § 303(d) list for lack of coldwater fish assemblage and "due to a biological impairment as indicated by a poor warmwater fish . . . score" on the Indices of Biological Integrity. The EPA approved this designation in 2003. During the 2006 assessment cycle, Little Rock Creek was removed from the § 303(d) list when an examination revealed that it was designated as a Class 2A coldwater stream and, at that time, the MPCA lacked the tools to properly assess the biology of coldwater streams. In 2010, the MPCA again placed Little Rock Creek on the § 303(d) list because it failed to meet water quality standards for dissolved oxygen and nutrients, and due to the "lack of a coldwater assemblage." The EPA approved the list in 2012.

Following Little Rock Creek's initial placement on the § 303(d) list in 2002, the MPCA began working with the Benton County Soil and Water Conservation District and the Morrison County Soil and Water Conservation District (the SWCDs) on the Little Rock Creek TMDL, using a three-phased approach.

In phase I, the MPCA collected and organized existing data and developed a list of potential stressors on the Little Rock Creek watershed area.

In phase II, the MPCA, in conjunction with the SWCDs, produced a Stressor Identification Report to "identify stressors contributing to [the] lack of cold water fish assemblage in Little Rock Creek." "Stressors" are "[the] specific physical and/or chemical factors that . . . caus[e] [a] biological impairment." The MPCA invited local, state, and

5

federal agencies, interest groups, organizations, and citizens to participate in the process and provide input into the development of the TMDL. The Stressor Identification Report was published in 2009 and included watershed data, stakeholder meeting comments, technical group meetings and coordination information, causal analysis, and stressor identification documentation, "contain[ing] the complete stressor identification for lack of cold water fish assemblage." The study "used a variety of methods to evaluate the current loading and contributions from the various pollutant sources," along with "the allowable pollutant loading capacity of the impaired reaches." The report concluded that "it is probable that altered flow, temperature, sediment, dissolved oxygen, and nitrates may be causing a biological impairment in Little Rock Creek."

Following the release of the Stressor Identification Report, the MPCA developed a draft TMDL work plan in phase III of the project for "temperature, bedded sentiment, nitrates, and dissolved oxygen, by calculating the total pollutant load with reference to flow as [a] source of impairment." The specific objective of the TMDL was to "determine the type and degree of pollutant source reductions needed to achieve the water quality standards . . . for drinking water . . . [and] temperature" in the water. The TMDL advised that in order to satisfy water quality standards, Little Rock Creek required a 52% reduction in total oxygen demand; a 19-47% reduction in the nitrate load, depending on flow conditions; and a 1% reduction in thermal loading. The TMDL developed an implementation plan to address the water's stressors and their sources. The TMDL stated that the "ideal combination" of implementation strategies and best management practices would include: (1) reducing groundwater use, which could include limiting total

6

appropriations, improving irrigation efficiency, scheduling and technologies, and identifying alternative sources; (2) reducing nutrient and organic constituents; and (3) creating "more of a free flowing system" to improve connectivity and temperature issues.

The MPCA submitted its draft TMDL to the EPA in November 2012 for preliminary review. The EPA provided comments on the TMDL, which the MPCA incorporated. The MPCA held a public comment period and posted a draft of the study on its website. The MPCA received, and responded to, nine timely written comments.

The MPCA's approval of a TMDL is a final decision of the agency and is subject to the contested-case hearing procedures of the Administrative Procedure Act. Minn. Stat. § 114D.25, subd. 2 (2014); Minn. Stat. Ann. § 14.57(a) (2014). The MPCA received two timely petitions for a contested-case hearing on Little Rock Creek's TMDL study. The petitions are largely identical and raised issues relating to "(1) the natural backgrounds in load allocations; and (2) the effect of reducing nitrate loading on bio-accumulative toxin methyl-mercury and for blue-green algae." The MPCA determined that "the petitions do not meet the threshold petition content requirements by stating reasons to hold a [contested-case hearing] and by stating issues to be addressed and specific relief requested." The MPCA concluded that "the issues raised . . . do not meet the requirements for granting a [contested-case hearing]" and denied the petitions.

This certiorari appeal follows.

## D E C I S I O N

### I.    Relators have standing to pursue this appeal.

#### a.  Standard of Review

"Standing is a legal requirement that a party have a sufficient stake in a justiciable controversy to seek relief from a court." *McCaughtry v. City of Red Wing*, 808 N.W.2d 331, 338 (Minn. 2011) (quotation and citation omitted).  Standing is conferred upon a party in one of two ways: either the plaintiff has suffered an injury-in-fact or the plaintiff maintains a statutory right to sue.  *Nash v. Wollan*, 656 N.W.2d 585, 588 (Minn. App. 2003).  "The purpose of the standing requirement is to ensure that issues before the court will be vigorously and adequately presented."  *State ex rel. Hatch v. Allina Health Sys.*, 679 N.W.2d 400, 404 (Minn. App. 2004) (quotations omitted).  Because standing is a jurisdictional issue, we evaluate standing determinations de novo. *In re Custody of D.T.R.*, 796 N.W.2d 509, 512 (Minn. 2011).

#### b.  A legislative enactment grants relators standing.

The MPCA challenges relators' standing to pursue this appeal.  Standing may be acquired "when a party is the beneficiary of some legislative enactment granting standing." *Citizens for a Balanced City v. Plymouth Congregational Church*, 672 N.W.2d 13, 18 (Minn. App. 2003) (quotation omitted).  Minnesota Statutes section 114D.25, subdivision 2, provides that "[t]he approval of a TMDL by the [MPCA] is a final decision of the agency for purposes of section 115.05, and is subject to the contested case procedures of sections 14.57 to 14.62."  Minnesota Statutes section 115.05, subdivision 11 (2014), provides that

"[a]ny person aggrieved by any final decision of the [MPCA] may obtain judicial review thereof pursuant to sections 14.63 to 14.69."

The MPCA argues that relators are not "aggrieved" parties within the meaning of section 115.05. An "aggrieved person" is

> one who is injuriously or adversely affected by the judgment or decree when it operates on his rights of property or bears directly upon his personal interest. The word "aggrieved" refers to a substantial grievance, a denial of some personal or property right, or the imposition on a party of a burden or obligation.

*In re Application by City of Rochester for Adjustment of Serv. Area Boundaries*, 524 N.W.2d 540, 542 n.1 (Minn. App. 1994) (citing *In re Getsug*, 290 Minn. 110, 114, 186 N.W.2d 686, 689 (1971)).

Relators argue that they are aggrieved parties because they will be affected by the pollutant load limits imposed as a result of the Little Rock Creek TMDL, including lower property values and compliance costs. The MPCA argues that relators' claims are too speculative and remote at this stage because the draft TMDL was merely "one step in a long chain" that may eventually cause relators "unspecified injuries." *See, e.g.*, *Missouri Soybean Ass'n v. U.S. E.P.A.*, 289 F.3d 509, 513 (8th Cir. 2002) (dismissing case on jurisdictional grounds where appellants challenged the EPA's approval of Missouri's § 303(d) list because appellants' claims of potential harm were too remote).

We previously rejected a similar argument. In *Minn. Envtl. Sci. & Econ. Review Bd.*, municipalities, public-utilities commissions, sanitary sewer districts, and farmers who were potentially affected by changes in clean-water rules sought declaratory judgment in a

9

pre-enforcement challenge to water quality standards promulgated by the MPCA. 870 N.W.2d at 98-99. The MPCA argued that petitioners lacked standing because they "fail[ed] to specify any specific rights which [were] currently affected" and their potential harms were "too tenuous and rel[ied] on too many indeterminate assumptions" to establish standing. *Id*. at 100. We disagreed and determined that petitioners had standing to bring an action for a pre-enforcement declaratory judgment. *Id*. at 100-01 (stating that petitioners were among "the class of persons who would be affected" by a change in water quality standards and had a "more particularized interest" in the outcome of the decision).

The Third Circuit Court of Appeals also determined that standing existed in a similar case. In *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, the EPA published the TMDL of pollutants nitrogen, phosphorous, and sediment that could be released into Chesapeake Bay. 792 F.3d 281 (3d Cir. 2015), *cert. denied sub nom. Am. Farm Bureau Fed'n v. E.P.A.*, 136 S. Ct. 1246 (2016). Appellants were trade associations with members who would be affected by implementation of the TMDL. *Id*. at 287. The appellate court raised the issue of standing sua sponte. *Id*. at 292. The court acknowledged that there was "a plausible argument that [appellants'] injury is insufficiently particularized and too speculative," as it was unclear "precisely what form new regulations will take." *Id*. at 293. However, the court also recognized that appellants would "incur compliance costs when the TMDL is implemented and enforcement mechanisms are put in place," and determined that appellants had standing to challenge the EPA's approval of the TMDL. *Id*. at 292-94.

Because relators stand to be adversely affected by a final decision from the MPCA which bears directly upon their personal interest, we determine that relators fit within the

definition of an "aggrieved party" and have statutory standing to challenge the MPCA's action.[2]

## II. The MPCA's decision was supported by the factual record and by controlling federal and state law.

### a. Standard of Review

The MPCA's approval of a TMDL is a "final decision of the agency for purposes of section 115.05." Minn. Stat. § 114D.25, subd. 2. We review a final decision of the MPCA under the Minnesota Administrative Procedures Act, Minn. Stat. §§ 14.63-.69 (2014). Minn. Stat. § 115.05, subd. 11. We will affirm the MPCA's decision unless its findings, inferences, conclusions or decisions are affected by an error of law, unsupported by substantial evidence in view of the entire record as submitted, or are arbitrary and capricious. Minn. Stat. § 14.69(b)-(f) (2014). We afford the decision of an administrative agency "a presumption of correctness" and defer to the agency's expertise. *In re N. Dakota Pipeline Co. LLC*, 869 N.W.2d 693, 696 (Minn. App. 2015), *review denied* (Minn. Dec. 15, 2015) (citation omitted). We defer to the agency's decision as long as it is reasonable and supported by substantial evidence, and we will not replace the agency's findings with our own. *In re Rocheleau*, 686 N.W.2d 882, 891 (Minn. App. 2004), *review denied* (Minn. Dec. 22, 2004). However, we are not bound by an agency's rulings on matters of law and we review legal issues de novo. *Cable Commc'ns Bd. v. Nor-west Cable Commc'ns P'ship*, 356 N.W.2d 658, 668-69 (Minn. 1984). "On appeal, the party challenging the agency's

---

[2] The MPCA also challenges whether relators have injury-in-fact standing. Because we determine that relators may assert a claim as aggrieved persons, we do not reach this argument.

decision [bears] the burden of proof." *In re Reichmann Land & Cattle, LLP*, 847 N.W.2d 42, 46 (Minn. App. 2014), *aff'd*, 867 N.W.2d 502 (Minn. 2015).

### b. The MPCA's approval of the TMDL without a separate determination of "natural background" sources was neither an error of law nor arbitrary and capricious.

EPA regulations define the TMDL for a pollutant as the sum of (1) the "wasteload allocation" for point source pollution; (2) the "load allocation" for nonpoint source or natural background pollution; and (3) a margin of safety. *See* 40 C.F.R. § 130.2(g)-(i); Minn. Stat. § 114D.15, subd. 10. "Natural background" includes those characteristics of a body of water "resulting from the multiplicity of factors in nature, including climate and ecosystem dynamics, that affect the physical, chemical, or biological conditions in a water body, but does not include measurable and distinguishable pollution that is attributable to human activity or influence." Minn. Stat. § 114D.15, subd. 10.

In its report to the EPA, the MPCA explained its methodology for arriving at load allocations, wasteload allocations, and margins of safety.[3] The MPCA attributed zero discharge to point source categories such as wastewater treatment facilities, concentrated animal feeding operations, construction activities, and municipal and industrial stormwater sources. The MPCA attributed less than one percent to construction and industrial

---

[3] "Wasteload allocation" is "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution." 40 C.F.R. § 130.2(h). "Load allocation" is "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." *Id.*, (g). Load allocations are "best estimates of the loading" and range "from reasonably accurate estimates to gross allotments, depending on the availability of data and appropriate techniques for predicting the loading." *Id.*

stormwater, and applied a ten-percent margin of safety "to account for uncertainty" in the allocation. The remaining 89.9% was attributed to "nonpoint pollution sources" and "natural background sources."

Relators argue that the MPCA failed to separately distinguish the pollutant loads attributable to the "natural background" of Little Rock Creek from those attributable to nonpoint source loads. "Wherever possible, natural and nonpoint source loads should be distinguished." 40 C.F.R. § 130.2(g). The MPCA acknowledges that the TMDL did not include a separate load allocation for natural background sources, but notes that "nearly the entire pollutant loading to Little Rock Creek is from nonpoint sources and natural background, and current research is not sufficient to differentiate between nonpoint and natural background sources of pollutants." Our review of the record supports the MPCA's assertion that "consideration of natural background enter[ed] into essentially every phase of MPCA water quality programs." By way of example, the Stressor Identification Report reveals that the MPCA considered "physical," "chemical," "biological," and "other" stressors in the Little Rock Creek watershed, and eliminated physical stressors such as "[e]levation, habitat variety, in-stream habitat, land use, riparian zone, warm-water vs. cold-water environments, lakebed sentiment, and wetlands/drainage" because such natural background sources "were not deemed to be primary causes of impairment based on the group's professional judgment." Instead, the MPCA determined that the Little Rock Creek watershed area "is highly altered by human influenced agricultural land uses."

The record supports the conclusion that the MPCA gathered and considered natural background sources but did not assign a separate load allocation to those sources due to

13

their marginal impact on Little Rock Creek's overall water quality. This determination is consistent with *Sierra Club, N. Star Chapter v. Browner*, 843 F. Supp. 1304 (D. Minn. 1993). The *Sierra Club* court recognized that the "plain language" of clean water regulations requires consideration of "both point, nonpoint, and natural sources" of pollutants in the water. *Id*. at 1313. In that case, the court found "no evidence" that the MPCA failed to consider nonpoint and natural sources of pollution when it developed the TMDL, and noted that the TMDLs may be based on point source pollution "when nonpoint and background sources have relatively little impact on water quality." *Id*. at 1314.

Relators argue that the "plain language" of the statute requires the MPCA to develop a separate load allocation for the natural background of Little Rock Creek. Federal law instructs an agency to distinguish between natural and nonpoint source loads "[w]herever possible." 40 C.F.R. § 130.2(g). However, Minnesota law does not compel the MPCA to develop a separate load allocation for natural background sources, distinct from nonpoint sources. A review of the statutory language is instructive. Chapter 114D defines a TMDL as "the sum of pollutant load allocations for all sources of the pollutant" based on four elements: "a wasteload allocation for point sources, a load allocation for nonpoint sources and natural background, an allocation for future growth of point and nonpoint sources, and a margin of safety." Minn. Stat. § 114D.15, subd. 10. Relators argue that "nonpoint sources" and "natural background" should be interpreted as separate elements. This interpretation is not supported by the plain and unambiguous language of the statute. The portion of the statute that defines TMDL contains four clauses, each of which is separated by a comma from the other clauses. *Id*. The phrase "a load allocation for nonpoint sources

14

and natural background" is set off by commas from the remaining three clauses. *Id.* If "nonpoint sources" and "natural background" were intended to be read separately they would have been separated by a comma or other disjunctive phrase. *See, e.g.*, *State v. Rausch*, 799 N.W.2d 19, 23 (Minn. App. 2011) (advising that statutory language that is not "subdivided or separated" should be read as a whole) (citing *Munger v. State*, 749 N.W.2d 335, 338 (Minn. 2008) (stating that under "normal rules of grammatical construction," a statute's several parts will be interpreted separately when signified by a disjunctive conjunction or separated by a comma)). Here, "nonpoint sources" and "natural background" are not separated by a comma or otherwise set apart from one another. *See* Minn. Stat. § 114D.15, subd. 10. Thus, according to a plain and ordinary reading of the statute, the legislature chose not to separate "nonpoint sources" from "natural background." Therefore, relators' assertion that the statute requires the MPCA to develop an independent load allocation for nonpoint sources, as well as a second load allocation for natural background, is not well-founded. *See Dupey v. State*, 868 N.W.2d 36, 39 (Minn. 2015) ("[I]f the statutory language is unambiguous, [the court] must enforce the plain meaning of the statute and not explore the spirit or purpose of the law."); *Christianson v. Henke*, 831 N.W.2d 532, 536 (Minn. 2013) (discussing statutory interpretation).

Relators also argue that Minn. R. 7050.0170 "establishes a simple procedure for determining the 'natural background'" that the MPCA failed to utilize. Rule 7050.0170 provides that "[n]atural conditions exist where there is no discernible impact from point or nonpoint source pollutants attributable to human activity or from a physical alteration of wetlands." *Id.* These "[n]atural background levels are defined by water quality

15

monitoring." *Id*. "Where water quality monitoring data are not available, background levels can be predicted based on data from a watershed with similar characteristics." *Id*. "Where background levels exceed applicable standards, the background levels may be used as the standards for controlling the addition of the same pollutants from point or nonpoint source discharges in place of the standards." *Id*. Rule 7050.0170 does not control our analysis because relators have not identified any facts in the record suggesting that the natural background levels "exceed applicable standards." Moreover, rule 7050.0170 provides only that the agency "may" use natural background levels, and statutory construction informs us that "'[m]ay' is permissive." Minn. Stat. § 645.44, subd. 15 (2014).

On appeal, this court defers to the MPCA's expertise, *In re N. Dakota Pipeline Co. LLC*, 869 N.W.2d at 696, and we do not replace the agency's findings with our own. *In re Rocheleau*, 686 N.W.2d at 891. Based upon the agency record before us, along with our de novo review of the governing statutory framework, we determine that the MPCA did not err by considering nonpoint sources and natural background sources together in the creation of the Little Rock Creek TMDL.

### c. The MPCA did not exceed its scope of authority.

Relators argue that the MPCA exceeded the scope of its authority in approving the TMDL because only the DNR may regulate and control water usage in Minnesota. *See* Minn. Stat. § 103G.255 (2014) (authorizing the commissioner of natural resources to allocate and control the waters of the state). Relators have not provided authority to support this contention. Federal regulations require states to establish TMDLs for water quality for

impaired waters and require that "[d]eterminations of TMDLs shall take into account critical conditions for stream flow, loading, and water quality parameters." 40 C.F.R. § 130.7(c)(1) (2014). A TMDL also accounts for "the normal water temperatures, flow rates, seasonal variations, existing sources of heat input, and the dissipative capacity of the identified waters" in determining the total maximum thermal load where water temperature is an issue. *Id.*, (c)(2); *see also* 33 U.S.C. § 1313(c)(2)(A) (providing that a state's water quality standards must be established "taking into consideration [each body of water's] use and value"). For the reasons stated above, the MPCA correctly followed the procedures outlined by federal and state law in establishing a TMDL for Little Rock Creek and did not exceed its authority.

### III. The denial of a contested-case hearing was not error.

We review the denial of a contested-case hearing request under Minn. Stat. § 14.69. *In re Solid Waste Permit for the NSP Red Wing Ash Disposal Facility*, 421 N.W.2d 398, 403 (Minn. App. 1988), *review denied* (Minn. May 18, 1988). A contested-case hearing must be held if:

> A. there is a material issue of fact in dispute concerning the matter pending before the board or commissioner;
>
> B. the board or commissioner has the jurisdiction to make a determination on the disputed material issue of fact; and
>
> C. there is a reasonable basis underlying the disputed material issue of fact or facts such that the holding of a contested case hearing would allow the introduction of information that would aid the board or commissioner in resolving the disputed facts in making a final decision on the matter.

Minn. R. 7000.1900, subp. 1 (2009).

17

The party requesting a contested-case hearing bears the "burden of demonstrating the existence of material facts that would aid the agency before [it is] entitled to a contested case hearing." *Red Wing Ash Disposal Facility*, 421 N.W.2d at 404. Conversely, a contested-case hearing is unnecessary if there are no material facts in dispute. *In re Kandiyohi Co-op. Elec. Power Ass'n*, 455 N.W.2d 102, 106 (Minn. App. 1990). The MPCA has wide discretion to determine whether a party has met its burden to show that a contested-case hearing is warranted. *See, e.g.*, *In re N. States Power Co. v. Wilmarth Indust. Solid Waste Incinerator Ash Storage Facility*, 459 N.W.2d 922, 923 (Minn. 1990).

Relators argue that the MPCA erred by denying their request for a contested-case hearing. The MPCA denied relators' hearing requests on the ground that the petitions "fail[ed] to show the existence of a disputed material issue of fact" and instead disputed "the interpretation and application of law and guidance." We agree. Relators' petitions argued that nonpoint sources must be distinguished from natural background sources, and urged the MPCA to "properly determine the natural background levels of the load allocation" in light of this argument. The MPCA reasoned that hearings were unnecessary because relators' petitions asserted questions of law or policy, as opposed to questions of fact.[4]

---

[4] On appeal, relators argue that the MPCA must make further findings on the natural background levels, which could be more completely resolved through the introduction of testimony and evidence at a hearing. Relators contend that they will submit evidence in the form of scientific studies, reports, and expert witness testimony to aid in establishing load allocations. However, relators have not offered specific facts or information buttressing this argument. *See Red Wing Ash Disposal Facility*, 421 N.W.2d at 404 (stating that party failed to raise any fact issues which could be resolved in a contested-case hearing because they did not provide "any indication of what specific new facts an expert might

18

We therefore conclude that the MPCA did not err by declining to grant a contested-case hearing where the petitions asserted legal, rather than factual, arguments. *See Costle v. Pac. Legal Found.*, 445 U.S. 198, 204, 100 S. Ct. 1095, 1100 (1980) ("If a request for an adjudicatory hearing raises only legal issues, a hearing will not be granted[.]"); *In re Kandiyohi Co-op. Elec. Power Ass'n*, 455 N.W.2d at 106 ("Where no genuine or material issue of fact is presented the court or administrative body may pass upon the issues of law after according the parties the right of argument.") (quotations omitted).

**Affirmed.**

---

testify to"); Minn. R. 7000.1800, subp. 2(a) (predicating a hearing on the existence of a material issue of fact which supports "a board or commissioner decision to hold a contested case hearing").