**In the Matter of the Appeal of the Exclusion of Edward MOLNAR from Canterbury Park.**

No. A05–2261.

Court of Appeals of Minnesota.

Sept. 5, 2006.

Howard S. Carp, David G. Johnson, Borkon, Ramstead, Mariani, Fishman & Carp, Ltd., Minneapolis, MN, for relator Edward Molnar.

Mike Hatch, Attorney General, Gregory P. Huwe, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Racing Commission.

Mark A. Jacobson, Lindquist & Vennum, P.L.L.P., Minneapolis, MN, for respondent Canterbury Park.

Considered and decided by LANSING, Presiding Judge; RANDALL, Judge; and WILLIS, Judge.

## O P I N I O N

LANSING, Judge.

Edward Molnar appeals from an order of the Minnesota Racing Commission, upholding Canterbury Park's decision to exclude him permanently from its card club. Molnar argues that Canterbury Park violated his constitutional and statutory right to due process in its temporary-exclusion decision and that the racing commission abused its discretion on evidentiary issues and by upholding Canterbury Park's permanent-exclusion decision. Molnar also maintains that the commission exceeded its authority by affirming his permanent exclusion rather than imposing a fine. Because we conclude that Canterbury Park did not violate Molnar's due process rights and that the Minnesota Racing Commission did not err or abuse its discretion, we affirm.

## F A C T S

Canterbury Park is a privately owned corporation licensed by the Minnesota Racing Commission to conduct live racing. The commission has also authorized Canterbury Park to operate a card club on its premises. Edward Molnar has been a regular patron of the card club since it opened in 2000. He also races and houses quarter horses at Canterbury Park.

### The Card Club

The operation of the card club is regulated by the racing commission. To obtain authorization to operate the card club, Canterbury Park formulated a plan of operation that provides the "necessary details for conducting card playing activities." Minn.Stat. § 240.30, subd. 6 (2004). Section VIII of this plan states Canterbury Park's intention to offer patrons a "clean, friendly and pleasant place to play cards" and reserves Canterbury Park's right to exclude from the card club any person who engages in "[t]alk or action demeaning of other players or employees."

Canterbury Park also requires all patrons to follow the "California Games House Rules," which prohibit, among other things, "[o]ffensive or abusive language." The commission's rules additionally require patrons to comply with a security

officer's orders and not to interfere in the performance of their official duties. Minn. R. 7897.0100, subp. 7 (2005). And Canterbury Park is authorized by statute to exclude from the card club any person who violates "any state law or commission rule or order or who is a threat to racing integrity or the public safety." *Id.* § 240.27, subd. 5 (2004).

### Molnar's First Exclusion

In August 2003, Canterbury Park excluded Molnar from the card club for nine months, based on allegations that he had inappropriately touched female employees. An employee reported that Molnar came up behind her, put his arm around her neck and whispered into and licked her ear. A card dealer also reported that Molnar had come up behind her and grabbed her around the waist. In response to these reports, a pit manager told Molnar that touching female employees was inappropriate and that Canterbury Park had a responsibility to take harassment accusations seriously.

A short time later, another card dealer reported that Molnar came up behind her and poked her in the side. She also reported a previous contact in which Molnar had come up behind her and rubbed her shoulders. Following this report, the pit manager told Molnar that he had received another complaint of inappropriate touching and asked him to leave.

In response to these reports, Canterbury Park appointed an exclusionary committee to review the allegations against Molnar and decide on an appropriate course of action. The committee investigated the reports and decided to exclude Molnar from the card club for nine months. The exclusion notice sent to Molnar indicated that Molnar could seek review of the committee's decision by writing to the security department. It also indicated that further inappropriate behavior would not be tolerated and would result in permanent exclusion. Molnar did not appeal to the security department or to the Minnesota Racing Commission, but instead inquired by phone, e-mail, and regular mail about the reason for his exclusion. In response to Molnar's inquiry, Canterbury Park sent Molnar a letter on December 30, 2003, stating that their "investigation gave [them] reasonable cause to believe that [Molnar] violated the rights of one of [Canterbury Park's] employees by touching her inappropriately." But Canterbury Park did not respond to Molnar's repeated requests for more specific information about the incident that led to his exclusion.

### Molnar's Second Exclusion

Molnar returned to the club in May 2004. In December, several employees complained that Molnar was making lewd comments, using profanity, making obscene gestures for hit signals, and covering his bets while giving the stay signal. The floor person and the assistant pit manager asked Molnar to stop this behavior. But when the assistant pit manager made this request, Molnar became orally combative. He was similarly combative when the assistant food-and-beverage manager took away his drink and told him that he would not be served more alcohol. And, when asked to leave the card club, Molnar refused to comply with a security officer's request to confirm his identification.

Canterbury Park convened its exclusionary committee again, and the committee determined to exclude Molnar permanently from the card club. This time, Molnar appealed the committee's decision to the racing commission. The commission designated an Exclusion Appeal Panel to hear the appeal.

In June 2005 the appeal panel, which consisted of three commission members, held an evidentiary hearing. The panel

continued the hearing after Molnar requested an opportunity to view Canterbury Park's surveillance videotapes and more time to prepare his case. When the hearing reconvened, both parties called witnesses, submitted documentary evidence, and presented oral argument.

The appeal panel issued findings, conclusions, and recommendations. The panel concluded that Molnar engaged in "unacceptable and inappropriate behavior on several occasions during 2003 and 2004," and that some of his behavior constituted sexual harassment and violated the law and Canterbury Park policies. The panel also concluded that Molnar failed to cooperate with security personnel. Based on these determinations, the panel recommended upholding Molnar's permanent exclusion from the card club. The panel also recommended that Canterbury Park be required to (1) post more prominently the card club's rules of conduct; (2) rename the "California Games House Rules," which govern appropriate behavior in the card club, to "Canterbury Card Club House Rules"; (3) add to the house rules a provision expressly prohibiting sexual harassment of patrons and employees; (4) make the plan of operation more accessible to the public; and (5) include the specific reasons for an exclusion in the notice of exclusion. The appeal panel found that, while Canterbury Park "did a less than perfect job" of alerting Molnar to the basis for his initial, temporary exclusion from the club, Molnar's exclusion was "procedurally adequate."

Molnar filed written objections to the appeal panel's findings, conclusions, and recommendations. The racing commission affirmed the panel's decision and issued an order upholding Molnar's permanent exclusion from the card club. This appeal follows.

## ISSUES

I. Did Canterbury Park violate Molnar's constitutional and statutory right to due process by temporarily excluding him from the card club without adequate notice and an opportunity for a hearing?

II. Are Canterbury Park's rules of conduct and plan-of-operation provisions void for vagueness?

III. Did the racing commission exceed its authority by affirming Molnar's exclusion from the card club instead of imposing a fine?

IV. Does the record support Molnar's claim that Canterbury Park destroyed or refused to provide him exculpatory videotapes depicting the behavior that formed the basis for his exclusion?

V. Is the racing commission's order affirming Molnar's exclusion supported by substantial evidence in the record as a whole?

## ANALYSIS

We review an agency decision to determine whether it violates constitutional provisions, exceeds the agency's jurisdiction or statutory authority, is made through unlawful procedure, is unsupported by substantial evidence in view of the entire record, or is arbitrary and capricious. Minn.Stat. § 14.69 (2004). Judicial review presumes the correctness of an agency decision. *Gramke v. Cass County,* 453 N.W.2d 22, 25 (Minn.1990). The party seeking review thus bears the burden of establishing that the decision violates one or more of the provisions of section 14.69. *Markwardt v. State, Water Res. Bd.,* 254 N.W.2d 371, 374 (Minn.1977).

Appellate courts retain the authority to review de novo an agency's determination of the meaning of words in a

statute. *In re Denial of Eller Media Co.'s Applications for Outdoor Adver. Device Permits,* 664 N.W.2d 1, 7 (Minn.2003). We will not defer to an agency's interpretation of its own rule if its interpretation is contrary to its plain meaning. *Citizens Advocating Responsible Dev. v. Kandiyohi County Bd. of Comm'rs,* 713 N.W.2d 817, 827 (Minn.2006). We accord deference, however, to an agency's expertise that is exercised within the scope of its authority, its findings on conflicting testimony, the weight given to expert testimony, and the inferences reasonably drawn from the testimony. *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.,* 624 N.W.2d 264, 278 (Minn.2001).

**I**

Molnar argues that Canterbury Park violated his constitutional and statutory right to due process by temporarily excluding him from the card club in August 2003 without adequate notice and an opportunity for a hearing. We disagree.

### Constitutional Violation

 The Fourteenth Amendment protects liberty and property rights against state action, but offers no protection against private conduct. *Blum v. Yaretsky,* 457 U.S. 991, 1002, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982); *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948) (stating that Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful"); *Coller v. Guardian Angels Roman Catholic Church,* 294 N.W.2d 712, 716–17 (Minn.1980) (holding that private-school teacher who directed state-sponsored program had no due process claim in absence of state action). Because Canterbury Park is a privately owned corporation, it is not ordinarily subject to the restrictions of the Fourteenth Amendment.

Molnar argues that Canterbury Park is subject to the Fourteenth Amendment because it is extensively regulated by, or in a symbiotic relationship with, the state. On this record, we conclude otherwise.

### • State Regulation

 Private conduct may be subject to governmental constraints when it is regulated by the state and "there is a sufficiently close nexus between the [s]tate and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the [s]tate itself." *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). No precise formula exists for determining when private conduct may be considered state action. *Gilmore v. City of Montgomery, Ala.,* 417 U.S. 556, 574, 94 S.Ct. 2416, 2427, 41 L.Ed.2d 304 (1974). But a well-settled principle indicates that, for Fourteenth Amendment purposes, the extensive regulation of a private business is alone insufficient to transform private conduct into state action. *See, e.g., Jackson,* 419 U.S. at 350, 95 S.Ct. at 453 (holding that customer of extensively regulated private utility did not have due process right to notice and hearing before termination of her service). The state is responsible for private conduct only "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [s]tate." *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786 (stating that mere authorization or approval of private initiative is insufficient to constitute state action). This requirement assures that "constitutional standards are invoked only when it can be said that the [s]tate is *responsible* for the specific conduct of which the [litigant] complains." *Id.* (emphasis in original).

In evaluating whether extensive state regulation of a private entity establishes a nexus that would fuse the entity's conduct and state action, we recognize a distinction between a private entity's request for approval of a particular practice and a regulatory body's requirement of the practice. *Jackson*, 419 U.S. at 355, 95 S.Ct. at 456. Approval of a private entity's practice when the regulatory body "has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the [private entity] and approved by the [regulatory body] into 'state action.'" *Id.* at 357, 95 S.Ct. at 456–57. Thus, when the initiative for a practice comes from a private entity and not the state, the private entity's choice to implement a practice allowed by state law does not amount to state action for purposes of the Fourteenth Amendment. *Id.*

The racing commission approved Canterbury Park's plan of operation, and Canterbury Park is statutorily authorized to exclude patrons who threaten racing integrity or the public safety. *See* Minn.Stat. § 240.27, subd. 5 (2004) (providing grounds for exclusion of persons from licensed race tracks). But the racing commission did not endorse the proposed practice by ordering it. The racing commission did not expressly scrutinize or approve the exclusion provision in the plan of operation, but merely authorized Canterbury Park to follow the permissible exclusionary practice. *See* Minn.Stat. § 240.30, subd. 6 (2004) (requiring licensees to submit for approval plan of operation that includes "all necessary details for conducting card playing activities," but not requiring exclusion policy). Ordinary authorization or approval of a private initiative is insufficient to convert private conduct into state action. *Blum*, 457 U.S. at 1004–05, 102 S.Ct. at 2786 ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the [s]tate responsible for those initiatives under the terms of the Fourteenth Amendment."); *see also Rendell–Baker v. Kohn*, 457 U.S. 830, 840–43, 102 S.Ct. 2764, 2771–72, 73 L.Ed.2d 418 (1982) (holding that regulation giving state agency power to approve private school's hiring decisions is insufficient to transform school's decisions into state action).

In addition to not endorsing the practice, the state did not initiate Molnar's exclusion. The Minnesota Racing Commission did not encourage Canterbury Park to exclude Molnar or otherwise participate in the exclusion decision. Canterbury Park's decision to exclude Molnar was made by Canterbury Park employees based on business standards established by Canterbury Park, not the state. *See Blum*, 457 U.S. at 1008, 102 S.Ct. at 2788 (holding that because decision of private nursing home "turn[ed] on medical judgments made by private parties according to professional standards that are not established by the [s]tate," decision did not amount to state action despite extensive regulation by state). The primary motivation to exclude Molnar was not a state interest, but was instead Canterbury Park's economic and private interest in maintaining a safe business environment and in preventing sexual harassment.

For these reasons, we conclude that Canterbury Park's exercise of a statutorily authorized choice to exclude Molnar does not equate to state action for Fourteenth Amendment purposes. The state's regulatory scheme in this case, however detailed, did not make the state a partner in Canterbury Park's exclusion decisions. Neither general involvement by the state nor extensive regulation is sufficient to support a finding of state action. *Scott v. Eversole Mortuary*, 522 F.2d 1110, 1115

(9th Cir.1975) (holding that extensive regulation of private entity does not convert private entity's conduct into state action). Instead, the evidence must show that the state affirmatively supported the private conduct challenged. *Musso v. Suriano,* 586 F.2d 59, 62 (7th Cir.1978). The evidence in this case does not show that the state affirmatively supported Canterbury Park's decision to exclude Molnar.

### · *Symbiotic Relationship*

Molnar also suggests that his exclusion from Canterbury Park amounts to state action because Canterbury Park and the state have a symbiotic relationship. But Molnar has not established that Canterbury Park and the state have a symbiotic relationship. A symbiotic relationship between a private entity and the state exists when the state has "so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961). In analyzing whether a symbiotic relationship existed between a state agency and a private entity, we consider whether the private entity benefits directly from state action, whether the state agency, in turn, benefits from the private entity's conduct, and whether the state agency was complicit in the objectionable policy based on its failure to intervene. *Id.* at 723–25, 81 S.Ct. at 861. Thus, when the state elects to "place its power, property and prestige behind" a private entity's action, the action "cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Id.* at 725, 81 S.Ct. at 862.

Molnar has not established that the state so far insinuated itself into a position of interdependence with Canterbury Park that it must be recognized as a joint participant in Canterbury Park's exclusion decisions. Molnar does not allege that Canterbury Park operates under a lease with the state, on public land, or in buildings owned and maintained by the state and dedicated to a public purpose. Nor does he allege that there is a mutually beneficial financial relationship between the state and Canterbury Park comparable to that in Burton. Like other corporations, Canterbury Park is subject to taxation by the state. *See* Minn.Stat. § 240.15 (2004) (providing for imposition of tax). And card-club revenue is subject to extensive regulations. *See id.* § 240.135 (2004) (requiring licensees to set aside certain amounts for designated purposes). But Molnar has not established, and the record does not reflect, a mutually beneficial financial relationship. *See Brennan v. Minneapolis Soc'y for Blind, Inc.,* 282 N.W.2d 515, 528 (Minn.1979) (determining that mutually conferred benefits between state and private entity did not establish symbiotic relationship). The record does not therefore support Molnar's claim that Canterbury Park and the state had a symbiotic relationship.

Because Canterbury Park, as a private corporation, was not constitutionally required to provide Molnar with a hearing before excluding him from the card club, we find no merit in Molnar's argument that Canterbury Park violated his constitutional right to due process.

### *Statutory Violation*

Relying on Minnesota Statute section 240.27, subdivisions 2 and 5 (2004), Molnar also argues that he was statutorily entitled to notice and a hearing before Canterbury Park first excluded him from the card club in 2003. But Molnar's claim is inconsistent with the plain meaning of the statute.

Subdivision 2 of the statute governs exclusion orders made by the commission, not the licensee. Minn.Stat. § 240.27, subd. 2 (providing that an "order to exclude a person from any or all licensed racetracks in the state must be made by the *commission* at a public hearing of which the person to be excluded must have at least five days' notice" (emphasis added)). Thus, by its terms, the statute does not apply to Canterbury Park's decision to exclude Molnar in 2003. Although subdivision 5 recognizes that a licensee may exclude a person from its premises, it requires a hearing only on appeal to the racing commission. *Id.,* subd. 5 (providing that person excluded by licensee from racetrack premises "must be given a public hearing on the appeal upon request"). Subdivision 5 therefore did not require Canterbury Park to provide Molnar with a hearing. And because Molnar did not appeal his initial exclusion to the commission, the commission had no statutory obligation to give Molnar a public hearing in connection with his initial exclusion.

Molnar argues that, because his first exclusion was a factor in the racing commission's decision to exclude him from the card club permanently, Canterbury Park violated his due process rights by failing to inform him that he had a right to a hearing on appeal. But Molnar has provided no authority to support his claim that Canterbury Park had a duty to advise him of his right to appeal the temporary exclusion.

## II

Molnar next argues that his exclusion from the card club violated his due process rights because the rules of conduct he was alleged to have violated were unconstitutionally vague. Specifically, Molnar claims that Canterbury Park's rules prohibiting "offensive or abusive language" and "[t]alk or action demeaning of other players or employees" were so ambiguous that they failed to give patrons reasonable notice of what conduct they prohibited and caused them to "guess at appropriate conduct." For two reasons, we disagree.

First, the vagueness doctrine applies only to legislative enactments. *See* Ronald D. Rotunda & John Nowak, *Treatise on Constitutional Law—Substance & Procedure* § 20.9 (2d ed. 1992) (explaining vagueness doctrine). The doctrine is embodied in the Due Process Clause of the Fourteenth Amendment, which "requires the *government* to give notice to individuals of government actions which would deprive those individuals of a constitutionally protected life, liberty, or property interest." *Id.* § 17.8 (emphasis added); *see Stephenson v. Davenport Comm. Sch. Dist.,* 110 F.3d 1303, 1308 (8th Cir.1997). Molnar does not challenge as vague the statute regulating the exclusion of persons from Canterbury Park; instead, he limits his challenge to Canterbury Park's house rules and section VIII of the plan of operation, neither of which is a legislative enactment. Unlike the state, Canterbury Park, as a private business, is not constitutionally required to give notice to patrons of actions that might deprive them of a constitutional right. Accordingly, the house rules and the plan of operation are exempt from the vagueness doctrine.

Second, even if the vagueness doctrine applied, vagueness challenges under the Due Process Clause must be analyzed as applied to the facts of the case at issue and "may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857, 100 L.Ed.2d 372 (1988). The record in this case reflects that Molnar knew that his conduct was at risk.

Molnar admitted that his behavior was "improper," and the record shows that he was repeatedly warned not to touch female employees and not to make remarks that were sexual or lewd. Molnar also admitted that he had seen the house rules but claims that he did not pay attention to them because they were entitled "California Games House Rules." Although the commission found the title of the house rules to be misleading and ordered Canterbury Park to rename the rules, the commission rejected Molnar's claim that he did not have notice that his conduct was improper. The commission's finding was based on credibility determinations and is therefore entitled to deference. *See Blue Cross & Blue Shield,* 624 N.W.2d at 278 (stating that credibility determinations, weighing of evidence, and drawing of legitimate inferences from facts are functions within discretion of fact-finder and, ordinarily, will not be overturned). Regardless of whether Molnar knew that his conduct was at risk, his vagueness challenge fails because the standard for overcoming a vagueness challenge is a reasonable-person standard. Even without the repeated warnings, a reasonable person in Molnar's position would have known that his conduct was at risk. We therefore are not persuaded by Molnar's vagueness challenge.

## III

■ Relying on the interplay between Minnesota Statutes sections 240.22 and 240.30, subdivision 7(c) (2004), Molnar next argues that the commission exceeded its authority by excluding him from the card club instead of merely fining him. These sections do not, however, restrict a licensee's authority to exclude patrons from its premises.

Section 240.22 authorizes the commission to establish a schedule of civil fines for violations of horse-racing laws or the commission's rules and to impose a fine from this schedule on a *licensee.* Minn. Stat. § 240.22 (2004). Section 240.30, subdivision 7(c), provides that a "violation of a law or rule relating to card club operation or a violation of an approved plan of operation is deemed to be a violation of law or rule for purposes of section 240.22." Read together, these sections provide that violations of a plan of operation or of laws or rules governing card-club operation may result in the imposition of a fine on the licensee.

Molnar argues that, by equating violations of an operational plan or card-club laws or rules to violations "for purposes of section 240.22," subdivision 7(c) grants Canterbury Park only the authority to fine patrons for those violations. For four reasons, we do not agree. First, the plan of operation and card-club operation are the responsibility of the licensee; patrons cannot, by violating either, subject themselves to a fine under subdivision 7(c). Second, section 240.22 expressly authorizes the commission to fine a *licensee,* not a patron of a licensee. Third, even if subdivision 7(c) applied to patrons of a licensee, the mere fact that it subjects certain violations to a fine does not necessarily mean that it precludes exclusion as a remedy for the same violations. Finally, Molnar's proposed construction of subdivision 7(c) is inconsistent with Minnesota Statute section 240.27, subdivision 5, which unambiguously authorizes licensees to exclude from its premises any "person who is in violation of any state law or commission rule or order or who is a threat to racing integrity or the public safety." *See* Minn.Stat. § 645.16 (2004) (providing that statute should be interpreted to give effect to all its provisions). The commission did not therefore exceed its authority by upholding Canterbury Park's exclusion decision instead of merely fining Molnar.

## IV

Molnar also argues that the racing commission abused its discretion by considering allegations of improper behavior despite Molnar's claim that Canterbury Park destroyed or refused to provide Molnar videotape evidence depicting the alleged behavior. The record does not, however, support Molnar's claim.

The exclusion-appeal panel issued a subpoena directing Canterbury Park to provide surveillance videotapes of the events that occurred in August 2003 and December 2004. Canterbury Park provided a complete videotape of the December events. But Molnar claims that Canterbury Park provided only an edited version of two of the incidents alleged to have occurred in August 2003. According to Molnar, "other video tape[s] [were] in the care, custody and control only of Canterbury Park and its employees. Either Canterbury Park violated the terms of the subpoena or destroyed evidence which likely would have been exculpatory." Molnar argues that because the videotape Canterbury Park provided was exculpatory, the court can reasonably assume that the videotape it did not provide would have been exculpatory too. We disagree.

Although Molnar raises this issue on appeal, he did not raise it at the hearing, in his objections to the panel's findings and conclusions, or during oral argument before the commission. The issue, therefore, is not properly before this court. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn. 1988) (stating that appellate courts generally do not consider issues not raised in proceedings below). Even if the issue were properly before this court, the record contains no evidence that any videotapes existed other than those that Canterbury Park submitted at the time of the hearing, that Canterbury Park destroyed or refused to produce those tapes, or that the

tapes would have been exculpatory. Molnar's claim is therefore without merit.

## V

Finally, Molnar argues that the racing commission's order upholding his permanent exclusion from Canterbury Park is not supported by substantial evidence in the record as a whole. We conclude otherwise.

The racing commission upheld Canterbury Park's decision to exclude Molnar from its premises permanently based on a determination that Molnar (1) engaged in unacceptable and inappropriate behavior, some of which violated Canterbury Park policies, the Minnesota Human Rights Act, and Title VII of the Civil Rights Act of 1964; (2) failed to cooperate with security personnel; and (3) constituted a threat to public safety.

The commission determined that Molnar violated Canterbury Park's policies against "abusive language" and conduct "demeaning of other players or employees," and the record supports the commission's determination. The record shows that, in August 2003, a waitress complained that Molnar had approached her from behind, put his arm around her shoulder, and whispered into and then licked her ear. The incident was recorded on surveillance videotape, which the commission reviewed in making its decision to uphold Molnar's exclusion.

A casino dealer testified that, while she was suiting cards, Molnar came by and grabbed her around the waist. She also stated that on a previous occasion Molnar rubbed her shoulders and that, despite requests that he not do so, Molnar made sexual remarks to her and to other female employees. Another dealer testified that Molnar put his hands on her sides and moved his hands upward by wiggling his fingers and palms. She also stated that

she had seen Molnar touch other employees inappropriately.

Another employee, who acts as both a supervisor and a dealer, similarly testified that in 2003 Molnar kissed her cheek. She stated that in 2004, she asked to be transferred to a different area because Molnar kept asking her to come around the table and give him a hug. She also stated that Molnar had a "really vulgar mouth," and she provided examples of Molnar's sexual comments.

Additionally, a pit manager testified that he spoke to Molnar about the complaint he had received from the dealers and told him that Canterbury Park needed to take sexual-harassment complaints seriously. Another pit manager testified that Molnar frequently made lewd comments and that he had received complaints from dealers about inappropriate touching. The pit manager also stated that Molnar was orally abusive and hostile when he was told that his behavior was not appropriate. The manager concluded that Molnar's behavior jeopardized gaming integrity. Finally, a security officer testified that Molnar refused his request for identification.

The record amply supports the racing commission's determination that Molnar's behavior was inappropriate, threatened public safety, and justified Canterbury Park's decision to permanently exclude him from the card club.

We also note that Canterbury Park's action was justified by its need to comply with federal and state anti-discrimination law. The Minnesota Human Rights Act (MHRA) prohibits unfair discriminatory practices in employment, housing, public accommodations, public services, and education. Minn.Stat. §§ 363A.08–.13 (2004). And Title VII of the Civil Rights Act (Title VII) prohibits discrimination in employment. Because Molnar is a casino patron rather than an employer, his actions would not directly invoke the provisions of either the MHRA or Title VII. But Canterbury Park could nonetheless be liable under Title VII for Molnar's sexually harassing conduct. *See Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1073–74 (10th Cir.1998) ("An employer who condones or tolerates the creation of [a hostile work] environment should be held liable regardless of whether the environment was created by a co-employee or a non-employee, since the employer ultimately controls the conditions of the work environment."); *Powell v. Las Vegas Hilton Corp.,* 841 F.Supp. 1024, 1028 (D.Nev.1992) (stating that employer may be held liable under Title VII for sexual harassment of employee by nonemployees, including customers, if employer knows or should have known of conduct and fails to take immediate and appropriate corrective action).

After employees complained about Molnar's inappropriate touching and sexually explicit comments, Canterbury Park had a duty to investigate and take appropriate action to avoid liability under Title VII. Molnar was repeatedly warned that touching female employees was inappropriate and exposed the club to liability for sexual harassment. The commission could reasonably conclude that Canterbury Park's actions were necessary to ensure compliance with federal and state anti-discrimination law.

## DECISION

Canterbury Park did not violate Molnar's constitutional or statutory right to due process when it excluded him from the card club in August 2003. Nor did the commission abuse its authority or its discretion by permanently excluding Molnar rather than merely fining him or by considering all allegations of improper behav-

ior. The commission's order is supported by the evidence in the record.

**Affirmed.**