COALITION OF GREATER
MINNESOTA CITIES,
Petitioner,

v.

MINNESOTA POLLUTION CONTROL
AGENCY, et al., Respondents.

No. A08–1198.

Court of Appeals of Minnesota.

May 12, 2009.

Christopher M. Hood, Robert T. Scott, Flaherty & Hood, P.A., St. Paul, MN, for petitioner.

Lori Swanson, Attorney General, Robert Roche, Assistant Attorney General, St. Paul, MN, for respondents.

Considered and decided by STONEBURNER, Presiding Judge; SHUMAKER, Judge; and COLLINS, Judge.

## OPINION

COLLINS, Judge.*

Petitioner Coalition of Greater Minnesota Cities (coalition) brings a pre-enforcement declaratory-judgment challenge to Minn. R. 7053.0255, subp. 4. The coalition contends that the rule grants "unbridled discretion" to respondents Minnesota Pollution Control Agency, et al. (MPCA), to deny exemptions to those with a new or expanded discharge of more than 1,800 pounds of phosphorus per year who would otherwise qualify for an exemption from the limit of one milligram per liter of phosphorus effluent, and that the rule therefore (1) violates Minn. Const. art. III, § 1, as an unconstitutional delegation of purely legislative powers; (2) is beyond the MPCA's rulemaking authority; and (3) violates the Minnesota Administrative Procedure Act. The MPCA contends that the coalition lacks standing to challenge the rule. We hold that the coalition has standing to challenge the rule, and we declare the rule valid.

## FACTS

This case concerns an MPCA rule governing phosphorus effluent discharges into the waters of Minnesota, Minn. R. 7053.0255, subp. 4. Under the previous version of the rule, when "the discharge of effluent is directly to or affects a lake or reservoir, phosphorus removal to one milligram per liter [is] required." Minn. R. 7050.0211, subp.1a (2007), *repealed by* 32 Minn. Reg. 1699 (Mar. 10, 2008). But when the discharge was not to a lake or

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

reservoir, the MPCA analyzed the effect of the discharge on downstream lakes and reservoirs. The MPCA initially used a "50–mile rule of thumb," in which it presumed, unless otherwise demonstrated, that an upstream discharge of phosphorus would not affect a downstream lake or reservoir more than 50 miles away by causing a significant change in algal growth. In 2000, the MPCA adopted its "phosphorus strategy," abandoning the "50–mile rule of thumb" in favor of a more detailed analysis of the effects of phosphorus discharge on downstream lakes and reservoirs.

Pursuant to this phosphorus strategy, several contested-case petitions were filed in an attempt to impose a 1 mg/L phosphorus effluent limit on various municipal facilities through a permit process under the National Pollutant Discharge Elimination System.[1] These contested cases primarily raised the issues of (1) whether a particular body of water was a "lake or reservoir" for purposes of the rule, and (2) the appropriateness of the MPCA's interpretation of the word "affects" as it related to how the municipal discharger's phosphorus effluent "affected" algal growth in a lake or reservoir.

In December 2003, the coalition and several other organizations representing municipalities proposed a clarifying amendment to Minn. R. 7050.0211, subp. 1a, to define "lakes and reservoirs" and to define the term "affect" for purposes of determining how the municipal discharger's phosphorus effluent "affected" algal growth in a lake or reservoir. Rather than initiate a separate, costly rulemaking procedure to address this proposal, the MPCA advised

that it would incorporate the proposal into its triennial review of water-quality standards, required by section 303(c)(1) of the federal Clean Water Act, which was already underway.

The review process was extensive, and it was not until July 2007 that the MPCA published notice of hearings and the proposed amendments. 32 Minn. Reg. 250 (July 30, 2007) (notice of hearing), 87 (July 23, 2007) (proposed rules). This proposal included amendments to rule 7050, concerning water-quality standards for the protection of state waters, and also transferred and amended some provisions containing the effluent limits and treatment requirements for discharges to the waters of the state to new rule 7053. 32 Minn. Reg. at 250–51.

While many topics were addressed in the notice and proposed rules, relevant to this proceeding is the MPCA's explanation of its proposal to extend the phosphorus effluent limit. The MPCA stated that protecting the quality and ecological integrity of Minnesota lakes, which "are the heart of our tourism industry," was considered essential to the state's economy. *Id.* at 251. The level of phosphorus discharge was considered important because "[e]xcess nutrients (especially phosphorus) produce algae blooms that negatively impact lake quality." *Id.* "To further protect lakes and rivers from the negative effects of excess nutrients, the MPCA is proposing that new or expanding dischargers must meet a 1 mg/L total phosphorus (TP) effluent limit after May 1, 2008, if they discharge more than 1,800 pounds of phosphorus per year." *Id.* at 252. The MPCA explained

1. The MPCA has authority to administer permits for the national pollutant discharge elimination system. Minn.Stat. § 115.03, subd. 5 (2008); *see In re Alexandria Lake Area Sanitary Dist. NPDES/SDS Permit,* 763 N.W.2d 303, 308–09 (Minn.2009) (addressing issue regarding such permits).

that the provision then found in Minn. R. 7050.0211, subp. 1a, which applied a "1 mg/L TP limit to dischargers if the discharge is directly to or affects a downstream lake or reservoir," would not change. *Id.* But "under this proposal, new or expanding facilities that discharge more than 1,800 pounds of phosphorus per year" also will be subject to the 1 mg/L limit without, as previously required, the need for the MPCA to demonstrate how the discharge would affect downstream lakes and reservoirs. *Id.* The MPCA also explained that proposed "rule language listing three situations that allow a discharger to demonstrate to the MPCA that the 1 mg/L limit should not apply to [the discharger]. The proposed exemptions reflect comments from outside parties and the experience gained in implementing nutrient-related TMDLs [total maximum daily load]." 32 Minn. Reg. at 252.

In its statement of need and reasonableness, the MPCA predicted that the requests for exemptions would be infrequent, perhaps three or fewer per year. The MPCA expressed its intent "to carefully review all requests, assess the merits of the request, and make a fair and reasonable decision, consistent with the stated overall purpose of the proposed extension of the [total phosphorus] limit, which is to prevent the eutrophication of surface waters through the reduction of [total phosphorus] loading from point sources."

After an administrative law judge (ALJ) conducted hearings on the proposed rules, made findings, and recommended that the rules be adopted, the MPCA citizens' board adopted the rules. The coalition filed its petition for a declaratory judgment with this court to bring a pre-enforcement challenge to Minn. R. 7053.0255, subp. 4.

## ISSUES

I. Does the petitioner have standing to bring a pre-enforcement challenge to the rule?

II. Does use of the term "may" in the challenged rule grant unbridled discretion to the agency and its administrative officers, violating Minn. Const. art. III, § 1, exceeding the agency's statutory authority, and violating the rulemaking procedures in the Minnesota Administrative Procedure Act?

## ANALYSIS

### I.

We first address the MPCA's argument that the coalition lacks standing to bring this pre-enforcement rule challenge. "This court has original jurisdiction to determine the validity of an agency's rules, including amendments," under Minn.Stat. § 14.44 (2008). *Minn. Chamber of Commerce v. Minn. Pollution Control Agency,* 469 N.W.2d 100, 102 (Minn.App.1991), *review denied* (Minn. July 24, 1991). But a petitioner must have standing to challenge an administrative rule under Minn.Stat. § 14.44. *Rocco Altobelli, Inc. v. State, Dep't of Commerce,* 524 N.W.2d 30, 34 (Minn.App.1994). Standing exists only "when it appears that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair the legal rights or privileges of the petitioner." *Id.* (quoting Minn.Stat. § 14.44). There must be a showing that the rule is or is about to be applied to the petitioner's disadvantage. *Id.* A mere possibility of an injury or mere interest in a problem does not render the petitioner aggrieved or adversely affected so that standing exists. *Id.*

The coalition, among other things, argues that the language of Minn. R. 7053.0255, subp. 4, leaves the applicability of the exemptions contained therein to the

"complete and unbridled discretion of the administrative officers charged with enforcing the Rule, with no discernable standard or policy to guide or otherwise constrain their action." The coalition contends that the overbroad application of the rule could be detrimental to its members, citing the costs to municipalities of complying with the 1 mg/L rule should the exemptions not apply, both in capital expenses to upgrade wastewater facilities and in additional operation and maintenance expenses.

The MPCA argues that the coalition's objections to rule 7053.0255, subpart 4, are not based on the application or threatened application of the rule, but instead are based on the coalition's proposed interpretation of the rule in a different hypothetical situation than was presented during the rulemaking proceedings. *See Minn. Educ. Ass'n v. Minn. State Bd. of Educ.*, 499 N.W.2d 846, 849–50 (Minn.App.1993) (holding that declaratory-judgment challenge to rule was premature, where it was based on proposed interpretation rather than threatened application); *see also Rocco Altobelli*, 524 N.W.2d at 35–36 (holding that beauty salon owners had no standing to bring pre-enforcement challenge to rule on the ground that it provided tax benefits to chair-leasing cosmetology establishments, where it could not demonstrate claim that rule reduced beauty salon owners' profits).

■ The coalition is not raising a hypothetical situation or a speculative claim of potential harm, but instead is citing the effects that an overbroad application of the rule would have on its municipalities, namely, requiring them to expend funds to upgrade, operate, and maintain wastewater facilities to comply with the rule. Without reaching the merits of the "unbridled discretion" argument at this point, we hold that the coalition has demonstrated

that the application or threatened application of the rule could interfere with or threaten to interfere with the interests of its members in obtaining exemptions, and it has standing to proceed with its challenge.

## II.

■■ We next address the merits of the coalition's pre-enforcement challenges. The reviewing court "shall declare the rule invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without compliance with statutory rulemaking procedures." Minn.Stat. § 14.45 (2008). Such pre-enforcement challenge "questions the process by which the rule was made and the rule's general validity before it is enforced against any particular party." *Manufactured Hous. Inst. v. Pettersen*, 347 N.W.2d 238, 240 (Minn.1984). The standard of review is more restricted than in an appeal from a contested enforcement proceeding in which the validity of the rule as applied to a particular party is adjudicated. *Id.* at 240–41.

The challenged rule limits the total discharge of phosphorus effluent to 1 mg/L when, in relevant part, the discharge of more than 1,800 pounds of phosphorus per year is new or expanded, unless the discharger can demonstrate that it qualifies for an alternative phosphorus limit or no limit under subpart 4. Minn. R. 7053.0255, subp. 3(A)(3) (Supp. II 2008); *see id.*, subp. 2(C), (F) (Supp. II 2008) (referring to new or expanded facilities discharging more than 1,800 pounds of phosphorus per year after May 1, 2008). Subpart 4 provides that if the discharger can demonstrate that it meets the standards for one of three possible exemptions, it "*may* qualify for an alternative total phosphorus limit

or no limit." Minn. R. 7053.0255, subp. 4 (emphasis added).[2]

### Challenge under the Minnesota Constitution

The coalition contends that because the rule provides that a discharger "may" rather than "shall" qualify for the exemption if it demonstrates that it can meet the standards for an exemption, the rule unconstitutionally delegates purely legislative power to the MPCA by granting the MPCA's administrative officers "unbridled discretion" to deny exemptions. We begin our analysis with the constitutional provision allegedly violated. "The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution." Minn. Const. art. III, § 1.

■■ The legislature "cannot delegate purely legislative power to any other body, person, board, or commission." *Lee v. Delmont*, 228 Minn. 101, 112, 36 N.W.2d 530, 538 (1949). But the mere fact that delegated power involves the exercise of discretion and judgment does not mean that it is purely legislative. *Id.*

> If the law furnishes a reasonably clear policy or standard of action which controls and guides the administrative officers in ascertaining the operative facts to which the law applies, so that the law takes effect upon these facts by virtue of its own terms, and not according to the whim or caprice of the administrative officers, the discretionary power dele-

gated to the board or commission is not legislative.

*Id.* at 113, 36 N.W.2d at 538–39. Further, "[t]he law provides an ample remedy for the abuse of a power without attacking the validity of its delegation." *Id.* at 115, 36 N.W.2d at 539 (citing as an example a mandamus action).

■ "The government cannot operate without agencies that exercise discretionary power." 3 Richard J. Pierce, Jr., *Admin. Law Treatise*, § 17.1 at 1227 (4th ed.2002). "The modern tendency is to be more liberal in permitting grants of discretion to administrative officers in order to facilitate the administration of laws as the complexity of economic and governmental conditions increase." *Anderson v. Comm'r of Highways*, 267 Minn. 308, 311–12, 126 N.W.2d 778, 780–81 (1964) (footnote omitted).

> [W]here the act relates to the administration of a police regulation which is necessary to protect the general health, welfare, and safety of the public—it is not essential that a specific prescribed standard be expressly stated in the legislation. This is so because it is impossible for the legislature to deal directly with the many details in the varied and complex conditions on which it legislates, but must necessarily leave them to the reasonable discretion of administrative officers.

*Id.* at 312, 126 N.W.2d at 781 (footnotes omitted).

Nonetheless, "conferring too much discretion on an individual or an institution creates the potential for harm attributable to abuse of discretion." Pierce, *supra*,

---

**2.** The MPCA notes that a discharger also has the option of seeking a variance. *See* Minn. R. 7053.0255, subp. 4 (providing that dischargers who seek an alternative limit based on very high per capita costs or economic hard-

ship must apply for a variance under Minn. R. 7000.7000 and 7053.0195); *see also* Minn. R. 7053.0195, subp. 1 (Supp. II 2008) (providing for application for variance based on variety of grounds).

§ 17.1, at 1227. "The challenge is to balance the need for discretion with the need for checks on discretion at each level of decisionmaking." *Id.* at 1233. "Rules are an effective limit both on agency discretion and on the discretion of agency personnel," *id.,* and the most powerful form of a rule is the legislative rule, which is adopted through a formal rulemaking process such as chapter 14; when valid, it can bind courts, members of the public, and the agency itself, *see id.* § 17.3 at 1238–39. Other forms of rules that have less power to limit an agency's discretion can include interpretive rules; those adopted in adjudicatory opinions or agency caselaw; published or unpublished "policy statements;" staff instructions; and unwritten rules or even an administrative officer's habit of stating that "my rule is . . . ." *Id.; cf. Lee,* 228 Minn. at 114–15, 36 N.W.2d at 539 (upholding decision by board against claim of unconstitutional delegation of legislative power, even though board failed to promulgate rules as required by enabling statute).

Thus, giving discretion to an agency is permissible and desirable. Further, the rule that the coalition challenges here is the most formal and binding type of rule that an agency can have to limit the discretion of the agency and its personnel. In addition, the coalition acknowledges that the three exemptions contain specific criteria that would constitute a "reasonably clear policy or standard of action" for the MPCA's staff to follow in evaluating an application for an exemption under Minn. R. 7053.0255, subp. 4.

The coalition asserts that the introductory clause immediately preceding these exemptions, which states that a discharger "may" qualify for an alternative limit or no limit if it can demonstrate that any of the three exemptions apply, "negates the specificity" of the exemptions. *See*

*Minnesota Administrative Procedure* § 23.4, at 363 (George A. Beck, et al. eds., 2d ed.1998) (stating that use of term "may" could effectively nullify specific criteria). The coalition argues that this constitutes an unconstitutional delegation of legislative power in violation of Minn. Const. art. III, § 1, because it does not furnish a reasonably clear policy or standard of action controlling and guiding the administrative officers, and instead leaves the decision to their unbridled discretion.

The legislature has defined "may" as "permissive," and "shall" as "mandatory." Minn.Stat. § 645.44, subds. 15, 16 (2008). Thus, any reasonable definition of may does not equal "unbridled discretion." *See The American Heritage Dictionary* 1315 (2d college ed.1982) (defining unbridled to mean "[u]nrestrained; uncontrolled"). Caselaw addressing the use of the term "may," as defined in section 645.44, subdivision 15, confirms that it refers to discretion. *See, e.g., Bolander v. Bolander,* 703 N.W.2d 529, 549 (Minn.App.2005) (holding that where Minn.Stat. § 302A.467 (2004) provides that a district court may grant equitable relief, decision is discretionary), *review dismissed* (Minn. Nov. 15, 2005); *Finch v. Marusich,* 457 N.W.2d 767, 770 (Minn.App.1990) (holding that where Minn. Stat. § 518.64, subd. 2 (1988), provides that a modification of support or maintenance may be made retroactive, decision by court is discretionary). Further, the law and rules concerning water-quality standards and effluent limits are for the general health and welfare of the public. *See, e.g., In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for Discharge of Treated Wastewater,* 731 N.W.2d 502, 510 (Minn.2007) (discussing the fact that the federal Clean Water Act requires states to establish water-quality standards that will protect the health or welfare of the public). Nor can the complexity of proceedings under these

laws and rules be doubted. It is these types of questions that the legislature "must necessarily leave ... to the reasonable discretion of administrative officers." *Anderson,* 267 Minn. at 312, 126 N.W.2d at 781 (footnote omitted).

At oral argument, the MPCA stated that an exemption would be granted if the statutory criteria were met, so long as there was not an overarching water-quality reason not to grant it. This statement, although not binding on the agency in the future, is a representation of the MPCA's attitude, which is contrary to the notion of unbridled discretion.

■ The manner in which the MPCA exercises its discretion in deciding whether to grant exemptions will evolve in the future. In addition, should a discharger believe that the MPCA is abusing its discretion in denying an exemption, that party can challenge the MPCA's decision. According to the MPCA, the discharger can challenge a denial of an exemption by petitioning for a contested-case hearing under Minn. R. 7000.1800 (2007), seeking a hearing before the MPCA citizens' board so that it may make a final decision on the matter, Minn.Stat. § 116.02, subds. 6–8 (2008), and, if necessary, petitioning for certiorari review by this court, Minn.Stat. § 115.05, subd. 11 (2008); *see* Minn.Stat. § 14.69(f) (2008) (providing that decision of agency may be reversed if arbitrary or capricious). In conclusion, the rule on its face grants permissible discretion to the agency and is not invalid as a violation of Minn. Const. art. III, § 1.

### Beyond Agency's Statutory Authority

The coalition also contends that Minn. R. 7053.0255, subp. 4, is unreasonable and exceeds the MPCA's statutory authority, primarily based on the argument that because of the use of the term "may," the MPCA has unbridled discretion to deny exemptions to those who otherwise qualify for them.

We first review the MPCA's statutory authority. Among other things, the MPCA has the power and duty "to administer and enforce all laws relating to the pollution of any of the waters of the state," and to investigate pollution of the waters. Minn.Stat. § 115.03, subd. 1(a), (b) (2008). It can "establish and alter such *reasonable* pollution standards for any waters of the state in relation to" their public use "as it shall deem necessary." *Id.,* subd. 1(c) (2008) (emphasis added). It is specifically authorized to adopt "reasonable" rules "in order *to prevent, control or abate water pollution,*" including establishing new effluent limitations. Minn.Stat. § 115.03, subd. 1(e)(8) (2008) (emphasis added).

The legislature also authorized the MPCA to adopt and design standards of quality and purity of waters and

> prescribe what qualities and properties of water indicate a polluted condition of the waters of the state *which is actually or potentially* deleterious, harmful, detrimental, or injurious to the public health, safety, or welfare; to terrestrial or aquatic life or to its growth and propagation; or to the use of the waters for domestic, commercial and industrial, agricultural, recreational, or other reasonable purposes ... Wherever practicable and advisable, the agency shall establish standards for effluent of disposal systems entering classified waters.

Minn.Stat. § 115.44, subd. 4 (2008) (emphasis added); *see also* Minn.Stat. § 115.03, subd. 5 (2008) (authorizing agency to perform acts necessary for participation in national pollutant discharge elimination system). Thus, under these provisions, the MPCA has broad and discretionary powers.

The coalition asserts that the MPCA attempted to make its otherwise overly broad 1 mg/L phosphorus limit reasonable by the use of the exemptions. It again points to the use of the term "may" in Minn. R. 7053.0255, subp. 4, as going beyond the powers authorized by the legislature to give the agency unbridled discretion. As we held above, the coalition cannot prevail in this argument because the term "may" refers to the use of permissible discretion.

■ Next, the coalition asserts that a clear example of arbitrariness is the MPCA's imposition of winter limitations on phosphorus discharge, contending that there is no support in the record showing that algal growth occurs in the winter. The coalition would have us re-weigh the evidence and second-guess the agency's judgment on a technical environmental issue, which we decline to do. *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 465–66 (Minn.2002) (deferring to technical expertise of agency). As it stands, the record supports the MPCA's decision.

### Violates Rulemaking Procedures

The coalition next argues that the MPCA violated the public-notice-and-comment rulemaking requirements in adopting Minn. R. 7053.0255, subp. 4, because the rule lacks a reasonably clear policy or standard to guide its administrative officers in evaluating applications for the exemptions, again based on the theory that the MPCA has unbridled discretion in deciding whether to grant an exemption. Although we view the rule as providing discretion, not unbridled discretion, to the agency to decide whether to grant an application for an exemption, we nonetheless address the coalition's arguments here.

■ "Rules must be adopted in accordance with specific notice and comment procedures established by statute, and the failure to comply with necessary procedures results in invalidity of the rule." *White Bear Lake Care Ctr., Inc. v. Minn. Dep't of Pub. Welfare*, 319 N.W.2d 7, 9 (Minn.1982) (citation omitted). An agency giving notice of a proposed rule "must include a description of the subject matter of the proposal and the types of groups and individuals likely to be affected[.]" Minn.Stat. § 14.101, subd. 1 (2008). It must also give notice of and hold a public hearing. Minn.Stat. § 14.14, subds. 1, 1a (2008). The purpose of the hearing is to ensure that the agency does not deprive the public of fair notice of the agency's intentions. *In re Hibbing Taconite Co.*, 431 N.W.2d 885, 894–95 (Minn.App.1988) (ruling that agency's broad policy was an improperly promulgated rule, where it has neither been submitted pursuant to the Administrative Procedure Act nor decided on a case-by-case basis under the specific facts of a particular case).

The ALJ issued findings of fact detailing the MPCA's compliance with the notice-and-comment requirements. "The [a]gency went to great lengths to inform and involve interested parties and the affected public in this rulemaking. The active participation of those persons and the accommodation by the Agency of many of their concerns demonstrates that the Agency more than adequately satisfied the notice requirements."

■ The coalition nonetheless asserts that the MPCA, in adopting a rule that lacks a clear standard for the agency's officers to follow in evaluating applications under the rule's exemptions, circumvented the public-notice-and-comment requirements, and instead reserved this legislative authority to the agency staff, who are free to deny applications for an alternative total phosphorus limit or no limit for any or no

reason. The coalition contends that the public, thus, received no notice of the agency's intentions as to how it would apply the rule's exemptions.

We disagree. As discussed above, the use of the term "may" indicates that the agency can exercise its discretion in deciding whether to authorize the exemption. Further, it is the adoption of this rule, particularly through the formal rulemaking process, that limits the discretion of the agency and agency personnel. *See* Pierce, *supra*, § 17.3, at 1238. The ALJ cited the exemptions as "[e]xamples of appropriately 'flexible' rule language," recognizing that they must be general enough so that applications for exemptions can be evaluated case by case on the merits.

> The Agency must retain enough flexibility to make individual decisions tailored to each case while providing enough guidance in the rule to inform parties of their obligations. No amount of prescriptive language in the [exemptions] could capture all possible relevant factors that will enter into these individual decisions; thus, more flexible language is warranted in this context.

The ALJ specifically recognized that the agency will have discretion as to the dispositions of petitions for exemptions.

### Overly Prescriptive

Finally, the coalition argues that Minn. R. 7053.0255, subp. 4, is overly prescriptive, in violation of Minn.Stat. § 14.002 (2008). Section 14.002 sets out the state's regulatory policy. While recognizing the importance of administrative rules, the legislature found that some rules had become "overly prescriptive and inflexible," thereby increasing governmental costs and decreasing flexibility. Minn.Stat. § 14.002. Therefore, whenever feasible, agencies are to develop rules "that emphasize superior achievement" and "maximum flexibility for the regulated party and the agency in meeting those goals." *Id.*

The coalition contends that the 1 mg/L limit for phosphorus effluent imposed on all new and expanding dischargers in Minn. R. 7053.0255 (Supp. II 2008), when considered in isolation, is unreasonable, overly prescriptive, and inflexible, because it applies in numerous instances where the environmental benefits of the limit are minimal and the cost of compliance is high. It asserts that the MPCA's attempts to meet the flexibility standard by the exemptions in subpart 4 are not appropriate because these exemptions grant the agency unbridled discretion and lack the specificity required by the APA, rending subpart 4 invalid.

First, the ALJ expressly found that the rules, including the revised phosphorus discharge rule, are consistent with section 14.002. Second, the MPCA and its officers have authority only to exercise their discretion in addressing exemptions, not, as we discussed above, their "unbridled discretion." Finally, the water-quality rules include a general variance provision that enables dischargers to demonstrate that a 1 mg/L phosphorus limit is not required on a case-by-case basis, Minn. R. 7053.0195, subp. 1, providing additional flexibility.

### DECISION

The coalition has standing to bring this pre-enforcement declaratory-judgment challenge to Minn. R. 7053.0255, subp. 4, but it failed to establish that the rule allows the MPCA to exercise "unbridled discretion" to deny applications for exemptions. Therefore, we conclude that the challenged rule is valid.

**Rule declared valid.**