*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1789**

United States Steel Corporation,
Relator,

vs.

Minnesota Pollution Control Agency,
Respondent.

**Filed July 27, 2015
Reversed and remanded
Stauber, Judge**

Minnesota Pollution Control Agency

Peder A. Larson, Connor T. McNellis, Larkin Hoffman Daly & Lindgren, Ltd., Minneapolis, Minnesota (for relator)

Lori Swanson, Attorney General, Adam Kujawa, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Bjorkman, Presiding Judge; Schellhas, Judge; and Stauber, Judge.

**U N P U B L I S H E D   O P I N I O N**

**STAUBER**, Judge

In this certiorari appeal, relator United States Steel Corporation (U.S. Steel) seeks review of an amended air-emissions permit issued by respondent Minnesota Pollution Control Agency (MPCA), arguing that certain conditions included in the permit constitute an invalid unpromulgated rule. We agree and, therefore, reverse and remand.

**FACTS**

In 2009, U.S. Steel applied to the MPCA for an air-emissions permit to increase capacity at its Keetac iron-ore mine and taconite-processing facility in Keewatin, Minnesota. Because the Keetac facility was shut down for more than a year, the permit was not issued until December 6, 2011. Construction under the permit had to commence within 18 months, but it was delayed for various reasons until the 2011 permit was no longer valid.

U.S. Steel applied for amendments to the 2011 permit in May 2012 and March 2013 to reflect the changed construction schedule and to request separate air-emissions limits for pre-expansion and post-expansion operations because the 2011 permit set air-emissions limits based on the assumption that the expanded facility was fully operational. The MPCA issued an amended air-emissions permit on September 17, 2014 (the 2014 permit), which included new air-emissions-dispersion remodeling requirements. These requirements reflected new standards that the MPCA was developing to create a less restrictive means of monitoring whether minor modifications made at regulated facilities would result in "equivalent or better dispersion (EBD)" of emissions.

The MPCA is responsible for enforcing the federal Clean Air Act, 42 U.S.C. § 7401 et seq. (2012), under rules enacted by the federal Environmental Protection Agency (EPA), which govern state air-emission permit programs. *See* 40 C.F.R. §§ 70.1-.12 (2014). Each state has "primary responsibility for assuring air quality" within its borders by implementing an air-emission plan. 42 U.S.C. §§ 7407(a), 7410. The MPCA

has done this through its air-quality rules, which are found at Minn. R. 7007.0050-.5000 (2013).

These rules govern "the issuance of permits to construct, modify, reconstruct, or operate" and "the revocation, reissuance, or amendment" of permits for any facilities that emit air pollutants. Minn. R. 7007.0050. The types of notice and other requirements for amended permits vary: for most "insignificant modifications," no permit amendment is necessary; for certain minor modifications, a party can apply for an "administrative amendment"; for minor and moderate permit amendments, there are more stringent notice requirements; and finally, for "major permit amendments," which include any significant change, a party must comply with the same permitting process as a new application. Minn. R. 7007.1150-.1500. The rules governing amendment of permits are detailed and were enacted pursuant to the MPCA's rulemaking authority. *See* Minn. Stat. § 116.07, subd. 4 (2014).

The MPCA is also responsible for administering the "Prevention of Significant Deterioration" (PSD) rules. Minn. R. 7007.3000. The PSD rules are intended to prevent significant deterioration in air quality by ensuring that regulated facilities do not evade the spirit of the law by increasing emissions to a point just below the maximum levels set forth in the Clean Air Act. If a regulated party makes a significant modification in a stationary source or changes a method of operation that results in increased emissions, the regulated party must apply for an amended permit. 40 C.F.R. § 52.21(b)(2) (2014). Under the federal rules, the MPCA determines what type of ambient monitoring a permittee must perform to demonstrate the effect that a modification has on air emissions.

3

40 C.F.R. § 52.21(m)(2) (2014).  The MPCA requires a permittee to perform "modeling" or "remodeling" to show the modification results in equivalent or better dispersion of emissions.

In the years preceding U.S. Steel's 2014 amended permit, the MPCA developed a new policy for remodeling requirements.  The MPCA created a tiered system based on how close a facility was to the permissible-emissions limits at the time of its previous modeling.  A facility where emissions were not close to the limits was placed in tier one; a facility that was very close to the limits was placed in tier four.  The modeling or remodeling requirements varied by the tier to which a facility was assigned.  After issuing some preliminary materials to explain the policy to the regulated community, the MPCA issued a written guidance to air-dispersion modeling using the new EBD standards in 2014.  These standards were intended to "protect ambient standards while simultaneously avoiding full refined modeling for minor changes at a facility."

The new EBD standards were incorporated into U.S. Steel's September 17, 2014 amended permit.  The 2014 permit stated separate requirements for pre- and post-expansion conditions; the MPCA based these on air-dispersion modeling that U.S. Steel had done during the application process.  These models showed that the Keetac plant was close to maximum emissions in some areas and therefore the amended permit included remodeling conditions.  Before the final permit was issued on September 17, 2014, the MPCA amended the permit after U.S. Steel objected so that a decrease in emissions would not trigger remodeling, but the amended permit still used the EBD standards to determine what type of modeling was required.

4

U.S. Steel filed a certiorari appeal under Minn. Stat. § 115.05, subd. 11 (2014), contesting the amended permit's new remodeling requirements. U.S. Steel objects to the EBD standards and tier method as unlawful rulemaking. The MPCA argues that the "tiered re-modeling approach is implemented through permit conditions and is not a rule."

## D E C I S I O N

Under the Minnesota Administrative Procedures Act (MAPA), Minn. Stat. §§ 14.001-.69 (2014), we may affirm, remand, reverse, or modify an agency decision if a party's substantial rights have been prejudiced because the agency decision was made in excess of the agency's statutory authority or upon unlawful procedure, affected by an error of law, unsupported by substantial evidence, or arbitrary or capricious. Minn. Stat. § 14.69. Agency decisions are presumed to be correct; the party seeking review of an agency decision has the burden of establishing that the decision violates provisions of section 14.69. *In re Molnar*, 720 N.W.2d 604, 610 (Minn. App. 2006). An agency decision must be supported by substantial evidence, but courts generally defer to an agency's expertise and special knowledge. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824-25 (Minn. 1977).

U.S. Steel argues that the MPCA acted upon unlawful procedure by implementing the EBD procedures as an unpromulgated rule. Under Minnesota law, a "rule" is "every agency statement of general applicability and future effect, including amendments, suspensions, and repeals of rules, adopted to implement or make specific the law enforced or administered by that agency or to govern its organization or procedure."

Minn. Stat. § 14.02, subd. 4 (2014). This is an "expansive definition." *In re PERA*, 820 N.W.2d 563, 570 (Minn. App. 2012). Thus, if an agency statement (1) has general applicability; (2) has future effect; and (3) is intended to interpret or create law, policy, or procedure, it is a rule. 21 William J. Keppel, *Minnesota Practice* § 5.01 (2nd ed. 2007). "Where important questions of social and political policy are involved, the rulemaking process must be followed. . . . If the legislature has placed the issue in the hands of an administrative official that official's decision ought to be based on a careful expression of all interested viewpoints." *In re Application of Crown CoCo, Inc.*, 458 N.W.2d 132, 138 (Minn. App. 1990) (quotation and citations omitted), *review withdrawn* (Minn. Sept .14, 1990).

Administrative rules can be either legislative or interpretive. *In re PERA*, 820 N.W.2d at 570. Legislative rules are statements of substantive law made pursuant to authority delegated to an agency; interpretive rules interpret or make specific the law administered by the agency. *Id.* Under Minnesota law, an agency is required to follow formal rulemaking procedures when enunciating either type of rule, subject to certain exceptions. *Id.* An agency may develop a policy through contested case proceedings, for example; adjudicated case decisions "generally provide a guide to action that the agency may be expected to take in future cases." *Eagle Lake of Becker Cnty. Lake Ass'n v. Becker Cnty. Bd. of Comm'rs*, 738 N.W.2d 788, 794 (Minn. App. 2007). But "[i]mportant questions of social or political policy are more appropriately promulgated as rules, while the application of specific facts to specific parties is more appropriate within an adjudicatory-type setting." *In re Investigation into Intra-LATA Equal Access &*

6

*Presubscription*, 532 N.W.2d 583, 590 (Minn. App. 1995), *review denied* (Minn. Aug. 30, 1995). Failure to follow statutory procedures for rulemaking "'results in invalidity of the rule.'" *Coalition of Greater Minn. Cities v. Minn. Pollution Control Agency*, 765 N.W.2d 159, 168 (Minn. App. 2009) (quoting *White Bear Lake Care Ctr., Inc. v. Minn. Dep't of Pub. Welfare*, 319 N.W.2d 7, 9 (Minn. 1982)), *review denied* (Minn. Aug. 11, 2009). But "[a]n unpromulgated interpretive rule is still valid if the agency's interpretation of a statute corresponds with its plain meaning, or if the statute is ambiguous and the agency interpretation is a longstanding one." *Minn. Transitions Charter Sch. v. Comm'r of Minn. Dep't of Educ.*, 844 N.W.2d 223, 233 (Minn. App. 2014) (quotations omitted), *review denied* (Minn. May 28, 2014). The label given a policy by an agency does not control whether it is a rule: "[r]ules are sometimes referred to as regulations, standards, directives, codes, and policies. They may also reflect the contents of manuals, bulletins, guidance documents, [and] even press releases." 21 *Minnesota Practice* § 5.01.

The MPCA argues that its tiered EBD policy is not a rule in application because "the [policy] is too closely imbedded in the particular facts to be stated in a general rule" and is "so specialized and varying in nature as to be impossible to capture within the boundaries of a general rule." *See Intra-LATA*, 532 N.W.2d at 590 (quotation omitted). The MPCA asserts that its "permitting staff decides the appropriate re-modeling language for a particular permit on a case-by-case basis, based on particular facts (i.e. prior modeling results)." Because of this, the MPCA contends that it has established a policy, rather than a rule; in doing so, it relies on *Minn. Chamber of Commerce v. Minn.*

*Pollution Control Agency*, 469 N.W.2d 100, 105 (Minn. App. 1991), *review denied* (Minn. July 24, 1991), in which this court held that site-specific standards applied on a case-by-case basis did not create rules because they are "not an agency statement of general applicability and future effect." *Id.*

The MPCA's use of its tiered approach to determine when a permit applicant must engage in remodeling differs from the factual situation in *Minn. Chamber of Commerce*. Although the EBD criteria are applied to the factual circumstances of each applicant, the MPCA's explanations of the policy set forth "statement[s] of general applicability and future effect." Each applicant for an air-emissions permit will receive a unique permit with requirements tailored to where their emissions fall in the EBD tiered scales, but these standards will apply generally to all applicants as certain criteria are met.

The MPCA must ensure that changes to a facility do not result in noncompliance with air emissions standards. *See* Minn. R. 7007.800; .1000 (setting forth agency duties to ensure compliance through permitting standards). This policy does not specify the exact manner in which the MPCA must act in order to ensure compliance. In this sense, the EBD policy could be an interpretation of the plain meaning of a statute, which would not be a rule. *See Elim Homes, Inc. v. Minn. Dep't of Human Servs.*, 575 N.W.2d 845, 848 (Minn. App. 1998) (stating that "lack of a definition . . . does not lead to an undeniable conclusion that the commissioner improperly promulgated a rule by interpreting the statute and finding a workable solution within the language he was given . . . [in light of] his expertise and knowledge"). And in *Minnesota Chamber of Commerce*, this court determined that, as long as the standards are applied on a site-

8

specific, case-by-case basis, an agency has not made an unpromulgated rule. 469 N.W.2d at 105. But *Elim Homes* involved a fairly simple interpretation of the phrase "total operating costs" as it applied in a comparison of nursing and non-nursing facilities. 575 N.W.2d at 848. And in *Minn. Chamber of Commerce*, the MPCA held hearings at several locations around the state and responded to public comments before establishing "methodology for deriving site-by-site criteria to determine water quality standards for toxic substances not assigned numerical standards" that did not have general applicability or future effect. 469 N.W.2d at 102, 105.

The various statements made by the MPCA regarding the EBD policy suggest that it is generally applicable in the future to permit applicants meeting certain criteria and that the EBD approach is meant to create a policy "to offer a more flexible means of demonstrating ongoing compliance with the applicable" national air quality standards. Although U.S. Steel's 2014 permit applies the EBD standards to U.S. Steel according to its history and circumstances, the standards nevertheless create a framework that is generally applicable in the future to all members of the regulated community.

MAPA rulemaking procedures were enacted for the purpose of "ensur[ing] that we have a government of law and not of men. . . . [A]dministrative officials are not permitted to act on mere whim, nor their own impulse, however well-intention[ed] they might be, but must follow due process in their official acts and in the promulgation of rules defining their operations." *In re Appeal of Jongquist*, 460 N.W.2d 915, 917 (Minn. App. 1990) (quotation omitted). Rulemaking guidelines ensure that those affected by a rule have notice and the ability to comment so that an agency can understand all the important

implications of a rule. *See Coalition of Greater Minn. Cities*, 765 N.W.2d at 168 ("The purpose of the [rulemaking] hearing is to ensure that the agency does not deprive the public of fair notice of the agency's intentions"); *see also Intra-LATA*, 532 N.W.2d at 590 (suggesting that an agency may forego formal rulemaking if the "notice and comment procedure alone will be inadequate to permit the agency to understand all the important implications of a rule").[1]

The MPCA's broad policy statements explain that the EBD standards would apply to all permit applicants who met certain criteria and that the approach is an attempt "to protect ambient standards while simultaneously avoiding full remodeling for minor changes at a facility" and "to reduce the administrative review and response time of the MPCA remodeling review for projects with minor dispersion changes." We conclude that the EBD tiered language is an unpromulgated rule: an "agency statement of general applicability and future effect" that is intended "to implement or make specific the law enforced or administered by that agency." Minn. Stat. § 14.02, subd. 4. We therefore reverse and remand this matter to the MPCA to issue a permit without the tiered language: "the failure to comply with necessary procedures results in the invalidity of the rule." *White Bear Lake Care Ctr., Inc.*, 319 N.W.2d at 9. U.S. Steel's objections to the 2014 permit must be sustained on this basis.

**Reversed and remanded.**

---

[1] Here, for example, the MPCA issued revisions to U.S. Steel regarding whether the EBD policy applied to modifications that *reduced* omissions; formal rulemaking procedures would have led to clarification of this issue before the policy was implemented. This suggests that a broader airing of the policy through formal rulemaking would ultimately be helpful.