**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1694**

Minnesota Environmental Science and Economic Review Board, et al.,
Petitioners,

vs.

Minnesota Pollution Control Agency,
Respondent.

**Filed August 10, 2015
Rules declared valid
Stauber, Judge**

Minnesota Pollution Control Agency
File No. 60-2200-30791

Steven Nyhus, Flaherty & Hood, P.A., St. Paul, Minnesota; and

John C. Hall (pro hac vice), Hall & Associates, Washington, D.C. (for petitioners)

Lori Swanson, Attorney General, Max Kieley, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Loyd W. Grooms, LWG, P.A., St. Paul, Minnesota (for amicus curiae Minnesota Chamber of Commerce)

Paige Stradley, Michael Erbele, Merchant & Gould, P.C., Minneapolis, Minnesota (for amicus curiae Minnesota Center of Environmental Advocacy, et al.)

        Considered and decided by Stauber, Presiding Judge; Schellhas, Judge; and Bjorkman, Judge.

## S Y L L A B U S

        As part of the rulemaking process, an agency must respond to public comments by explaining its decision and how the evidence rationally supports its action; a reviewing

court will not substitute its judgment if an agency can demonstrate that it has complied with rulemaking procedures and made a considered and rational decision.

## O P I N I O N

**STAUBER**, Judge

In this declaratory-judgment action, petitioners challenge the validity of certain water-quality standard rules promulgated by respondent Minnesota Pollution Control Agency (the MPCA), arguing that the agency failed to comply with statutory rulemaking procedures. We declare the rules valid.

## FACTS

This is a declaratory-judgment action brought under Minn. Stat. § 14.44 (2014). The petitioners include Minnesota Environmental Science and Economic Review Board (MESERB), Coalition of Greater Minnesota Cities (CGMC), League of Minnesota Cities (League), and Minnesota Soybean Growers Association (MSGA). Petitioners collectively represent municipalities, public-utilities commissions, sanitary sewer districts, and farmers who potentially are affected by changes in clean-water rules. The Minnesota Chamber of Commerce filed an amicus brief in support of petitioners' position. A number of environmental organizations filed an amicus brief in support of the position of the MPCA.

The MPCA is the state agency charged with enforcing the federal Clean Water Act (CWA), 33 U.S.C. §§ 1251-1387 (2012). *See* Minn. Stat. § 115.03 (2014). The MPCA has the authority to "establish and alter such reasonable pollution standards for any water of the state in relation to the public use to which they are or may be put as it shall deem

2

necessary." Minn. Stat. § 115.03, subd. 1(c). As a state agency, the MPCA must follow the provisions of the Minnesota Administrative Procedure Act (MAPA) when it engages in rulemaking. *See* Minn. Stat. §§ 14.001-.69 (2014). MAPA defines a "rule" as "every agency statement of general applicability and future effect, including amendments, suspensions, and repeals of rules, adopted to implement or make specific the law enforced or administered by that agency or to govern its organization or procedure." Minn. Stat. § 14.02, subd. 4.

Under the CWA, each state agency charged with administering the federal law must review the applicable water quality standards (WQS) at least once every three years. 33 U.S.C. § 1313(c)(1). In 2008, during a triennial review, the MPCA determined that it was necessary to address eutrophication standards for lakes.[1] In 2011, as part of another triennial review, the MPCA determined that it was necessary to address eutrophication standards for rivers and streams.

The MPCA has enacted WQS that are set forth in Minn. R. 7050.0110-0470 (2013). A WQS can be either narrative or numeric. A narrative WQS is a descriptive standard that describes impairment; for example, waters "shall not be degraded in any material manner" or show "undesirable slime growths or aquatic plants" or "harmful pesticide or other residues." Minn. R. 7050.0150, subp. 3. A numeric WQS is quantitative rather than descriptive, and it measures "the concentration of a pollutant in water, associated with a beneficial use and [the] narrative standards based on protecting

---

[1] Eutrophication refers to the over-enrichment of waters with nutrients, which stimulates excessive growth of aquatic plants.

that use." The numeric WQS are specific to each pollutant. Numeric standards are favored under the CWA. *See* 33 U.S.C. § 1313(c)(2)(B). The rulemaking challenged here involved the development of numeric WQS to limit eutrophication of rivers and streams. *See* Minn. R. 7050.150, .0220, .0222 (Supp. 2014).

The MPCA engaged in formal rulemaking procedures under MAPA in setting the new numeric WQS, including issuance of a statement of need and reasonableness (SONAR), publication of the proposed changes, public hearings, review by an administrative law judge (ALJ), post-hearing comments and rebuttal, supplementation of the record by petitioners, a comment period on the supplementary materials, recommendations by the ALJ, adoption of the amended rules by the MPCA Citizens' Board, additional testimony before the board, final adoption of the amendments by the board, and publication. Petitioners object to the amended WQS and brought this declaratory-judgment action to challenge adoption of the standards. At oral argument, petitioners emphasized that they are challenging the rulemaking process, and not the scientific basis for the rules.

## ISSUES

I.     **Do petitioners have standing to bring this declaratory judgment action?**

II.    **Did the MPCA violate statutory rulemaking procedures by failing to respond in a meaningful fashion to public comments?**

## ANALYSIS

Minn. Stat. § 14.44 permits an interested party to challenge the validity of an agency rule "when it appears that the rule, or its threatened application, interferes with or

4

impairs, or threatens to interfere with or impair the legal rights or privileges of the petitioner." A party may petition this court to declare a rule invalid if it violates the constitution, is in excess of statutory authority, or adopted without compliance with rulemaking procedures. Minn. Stat. § 14.45. In a preenforcement action, this court is limited to considering these three bases for a challenge. *Save Mille Lacs Sportsfishing, Inc. v. Minn. Dep't of Natural Res.*, 859 N.W.2d 845, 850 (Minn. App. 2015). This is a more restrictive standard of review than an appeal from a contested proceeding "in which the validity of the rule as applied to a particular party is adjudicated." *Coalition of Greater Minn. Cities v. Minn. Pollution Control Agency*, 765 N.W.2d 159, 164 (Minn. App. 2009), *review denied* (Minn. Aug. 11, 2009).

## I.

As a preliminary matter, the MPCA argues that petitioners lack standing because they "fail[ed] to specify any specific rights which are currently affected" and their "potential harms are too tenuous and rely on too many indeterminate assumptions to establish standing." To have standing to bring an action under section 14.44, a petitioner must show that a rule or its "threatened application" will interfere with or threaten to interfere with legal rights of the petitioner. *Rocco Altobelli, Inc. v. State, Dep't of Commerce*, 524 N.W.2d 30, 34 (Minn. App. 1994). A petitioner's interest must be different in character than the interest of the general citizenry. *Id.* The MPCA argues that petitioners are alleging hypothetical scenarios that "may or may not become actualized," and that will be harmful only if several contingencies are met.

5

In *Coalition of Greater Minn. Cities*, the petitioner, which represented many municipalities, challenged the new eutrophication rules for surface waters promulgated by the MPCA. 765 N.W.2d at 162-63. This court reasoned that the petitioner had standing to bring a preenforcement declaratory judgment action because of the effect "that an overbroad application of the rule would have on its municipalities, namely, requiring them to expend funds to upgrade, operate, and maintain wastewater facilities to comply with the rule." *Id.* at 164. Petitioners here make similar allegations.

In support of its position, the MPCA cites *Missouri Soybean Ass'n v. U.S. Envtl. Prot. Agency*, 289 F.3d 509, 511 (8th Cir. 2002), in which a federal court dismissed an action brought under the federal Administrative Procedures Act to challenge the EPA's list of pollution-impaired waters. The court concluded that the suit was not ripe for adjudication because the petitioner's claims of potential harm were too remote and, therefore, the court lacked jurisdiction. *Missouri Soybean*, 289 F. 3d at 513. After identifying the pollution-impaired waters, the EPA would have to both develop numeric standards for pollutants and implement them before the petitioners would be harmed. *Id.* at 512. Even then, the potential for harm to a member of petitioner's group was uncertain. *Id.*

But here, petitioners are challenging a rule that created numeric standards, not merely the inclusion of certain rivers on a list that would eventually lead to numeric standards. Petitioners are among the class of persons who would be affected by a change in WQS; the petitioning groups represent municipalities, wastewater-treatment facilities, sanitary sewer districts, and farming operations, all of which have a more particularized

interest than the general citizenry.  On these grounds, we conclude that petitioners have standing to bring an action for a pre-enforcement declaratory judgment.

## II.

Petitioners allege that the MPCA did not comply with statutory rulemaking procedures because the agency failed to adequately respond to petitioners' comments during the rulemaking process.  In particular, petitioners argue that the MPCA did not respond in a meaningful way because the agency relied on outdated studies or failed to make the studies it relied on part of the public record.

Agency rulemaking is strictly controlled by statute and the statutory procedures must be followed in order to create a valid rule.  *White Bear Lake Care Ctr., Inc. v. Minn. Dep't of Pub. Welfare*, 319 N.W.2d 7, 8-9 (Minn. 1982).  After a public hearing on a proposed rule, the ALJ overseeing the public hearings must allow for a comment period and must permit an agency to rebut or respond to comments made by the public.  Minn. Stat. § 14.15, subd. 1; Minn. R. 1400.2230 (2013).

Although no Minnesota case discusses the extent of an agency's duty to respond to comments, petitioners rely on federal caselaw under the federal Administrative Procedures Act to argue that an agency's response to comments must be "meaningful." *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492-93 (9th Cir. 2010) (stating that "agency renders the procedural requirement [of comments] meaningless" when it fails to offer a "meaningful response to serious and considered comments by experts"); *see also Int'l Fabricare Inst. v. U.S. Envtl. Prot. Agency*, 972 F.2d 384, 389 (D.C. Cir. 1992) (stating that court will overturn rulemaking as arbitrary and capricious if

agency fails to respond to specific challenges involving issues central to its decision). An agency must respond in a manner that states the main reasons for its decision and explains why the agency reached the decision it did. *Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993). We consider this standard to be implicit in the provisions of MAPA, which permits the public to submit comments to test a proposed rule. Minn. Stat. § 14.14, subd. 2a. An agency must respond to questioning "in order to explain the purpose or intended operation of a proposed rule, or a suggested modification, or for other purpose if material to the evaluation or formulation of the proposed rule." *Id.*

The MPCA responded to all of the written comments received after each public hearing. Each response includes a summary of the comment and a response with citations to the documents or sources that provide a basis for the response. The environmental groups that filed an amicus brief in support of the MPCA's position pointed out that they also had made comments during the rulemaking process and had disagreed with the MPCA's responses, but they nevertheless concluded that the MPCA had "considered and responded to [their] and Petitioner's concerns."

In addition to their assertion that the MPCA did not respond to their comments, petitioners argue that the MPCA failed to respond in a meaningful way about its choice of WQS on two of the disputed issues: the failure to distinguish between small streams and large rivers, and the basis for "using DO flux and BOD as nutrient response variables."[2] Petitioners argue that, in order to respond in a meaningful way, the MPCA

---

[2]"Daily dissolved oxygen variation" or "DO flux," is "the difference between the maximum daily dissolved oxygen concentration and the minimum daily dissolved oxygen

8

had a duty to provide a "scientific basis for its position on these issues," and that instead it relied on outdated or "secret" peer reviews of its studies.

We will not second-guess the MPCA's use of or reliance on its chosen scientific or technical sources. An agency decision, including rulemaking, enjoys "a presumption of correctness" and a court "should defer to an agency's expertise and special knowledge." *Peterson v. Minn. Dep't of Labor & Indus.*, 591 N.W.2d 76, 79 (Minn. App. 1999), *review denied* (Minn. May 18, 1999). An agency must "explain on what evidence it is relying and how that evidence connects rationally with the agency's choice of action." *Id.* (quotation omitted). Agencies must at times "make judgments and draw conclusions from suspected, but not completely substantiated, relationships between facts, from trends among facts, from theoretical projections from imperfect data, from probative preliminary data not yet certifiable as fact, and the like." *Manufactured Hous. Inst. v. Pettersen*, 347 N.W.2d 238, 244 (Minn. 1984) (quotation omitted).

In *Pettersen*, the supreme court concluded that the agency had not demonstrated a rational relationship between the record evidence and the proposed standard for ambient formaldehyde in housing. *Id.* at 246. In that agency record, the hearing examiner noted that "nothing in the record . . . justif[ies] the selection of [a lesser rather than a higher standard] other than the fact that the lesser concentration that exists, the less chance there is that any effects may be felt. Even that assumption is questionable, however, based upon the wide disparity of study results." *Id.* at 245 n.5. In contrast, here, the MPCA

concentration." "Five-day biochemical oxygen demand" or "$BOD_5$," is "the amount of dissolved oxygen needed by aerobic biological organisms to break down organic material present in a given water sample at a certain temperature over a five-day period."

cited a number of scientific studies that supported the disputed WQS standards, including an EPA review, DNR studies, and the opinion of an agronomist from the Water Resources Center at the University of Minnesota. The MPCA provided scientific studies to rebut the specific challenges to the failure to distinguish small streams from large rivers and to the use of $BOD_5$ and DO flux.

This record is extensive and includes scientific evidence to support the rules adopted by the MPCA. While the petitioners may not agree with the rules adopted, the MPCA explained the reasons for adoption and provided supporting documentation. This is a sufficient and meaningful response to the public comments in opposition to the proposed rules.

## D E C I S I O N

The MPCA responded to public comments in a meaningful way by describing its decision to adopt WQS for rivers and streams and how it reached that decision. By doing so, the MPCA followed the proper rulemaking procedures under MAPA, and the amendments to Minn. R. 7050.0150, .0220, and .0222 are valid.

**Rules declared valid.**